## KAHYIS v. ARUNDEL CORPORATION.
### No. 1920.

District Court, D. Maryland.
April 12, 1933.

George Forbes and Henry Wortche, both of Baltimore, Md., for libelant.

J. Kemp Bartlett, Sr., and Robert D. Bartlett (of Bartlett, Poe & Claggett), both of Baltimore, Md., for respondent.

CHESNUT, District Judge.

This is a libel in personam in admiralty under the general maritime law, by the libelant, an employee of the respondent, to recover damages for personal injuries in the course of his services. The basis of the claim is that the respondent furnished an unsafe place for the libelant to work, and that his injuries resulted in consequence thereof. The respondent admits the employment and accidental injury but denies any negligence or failure to provide a safe place for the libelant to work. It also pleads a release, which, however, at the trial, was not insisted on as an absolute bar.

The facts may be briefly stated as follows: The Arundel Corporation is engaged generally in dredging and contract work, and owned and, at the time of the accident, was operating a dredge Severn in the Patapsco river near Baltimore. The dredge is operated by

steam power. The accident occurred November 18, 1931, while the libelant was engaged as a fireman in the fireroom on the dredge Severn, in the performance of his usual duties. He had been employed in this capacity in the same fireroom for about four months prior to the accident. In a statement signed by him, by making his mark, on November 28, 1931, the occurrence of the accident to him is thus described:

"My name is William Kayhis, single, and am 36 years of age, reside at 316 South Bond Street. I have no dependents and am self-supporting. I am a fireman on the Dredge 'Severn' owned by the Arundel Corporation and have been working for them about 4 months.

"On November 18, 1931, about 12.20 A. M., I was breaking a fire with a slice bar, on the dredge 'Severn' which was lying in the Patapsco River, off of Canton, when the dredge, from some unknown cause, rolled and as it did I slipped and as I fell I struck my right arm against a winch, which is located about 5 feet from the fire box. I called the engineer and told him what happened, I then went to bed, and the next morning, the captain of the dredge sent me to Dr. Robt. Johnson in Brooklyn. He treated me and told me to come in the next day. When he examined my arm again he sent me to the U. S. F. & G. Clinic where an Xray of my arm was taken.

"The accident was not due to any carelessness of any of the crew or defectiveness of any part of the dredge, but to the rocking of the dredge which threw me down."

This statement was phrased by a clerk in the office of the respondent's insurance carrier. With the exception of the expression in the last sentence regarding "defectiveness of any part of the dredge," the account then given by the libelant of his accident was confirmed in substance by his testimony at the trial. He added at the trial that in stoking the fire in the fire box under the boiler a clinker in which his slice bar had been stuck, suddenly broke up while he was pulling on the bar, and this caused him to lose his balance and to suddenly fall backwards, in consequence of which his right arm came in forcible contact with the cylinder of the anchor winch which, as the testimony otherwise showed, was situated directly opposite the door of the fire box which he was stoking and distant therefrom 70½ inches. He also added that there was some water on the floor in the fireroom which tended to make it slippery in places and that this may have contributed to his losing his balance; but the water was not definitely located at the place where he lost his balance and I am not able to find as a fact that the water caused the floor to be slippery or contributed materially to the accident. The presence of the water was said to be due to the fact that there was a leaky valve in the room and some water had been intentionally thrown upon some dying ashes on the floor. The floor was a standard floor not shown to have been defective in any particular.

The libelant continued to receive medical and surgical treatment from the clinic of the respondent's insurance carrier for the period of seven weeks. This was furnished free of charge and during that period the respondent caused to be paid to the libelant the weekly sum of $10.77, which was two-thirds of his prior weekly wages. At the end of six weeks Dr. Hopkins, in charge of the clinic, advised the libelant that his arm had healed and that he could return to work. He did promptly report for work and asked for some light work, but was told by an executive officer in charge of dredging operations of the respondent that they had no light work at that time, and he was advised to return to the clinic, which he did, and was paid for another week, and then discharged as cured and ready for work. But the respondent by that time had laid up the dredge, which had completed its operations, and had no work of any kind to offer to the libelant.

Libelant's injury consisted of a simple break of the lower part of the ulna, the smaller bone in the forearm, not far from the wrist. The doctors, both for the libelant and the respondent, agree that there was a complete and satisfactory union of the bone so that the break was entirely repaired; but the libelant's doctor expressed the opinion that there was an impairment possibly to the extent of 50 per cent. of muscular power owing to the lack of proper massage or exercise of the arm after the break had healed, although he further thought that much of this loss of muscular power could still be repaired by proper exercise. On the other hand, respondent's doctor expressed the opinion that there was no appreciable loss of muscular power and that the libelant had been told when discharged to come back if he had any trouble with his arm, but had not reported for further treatment.

As a fact, I find that the medical treatment given to the libelant was skillful and careful and apparently adequate and there is no substantial permanent injury; although I also find that at the time the libelant was

discharged as cured his arm was still not in condition for heavy work. and would not have been for some time thereafter, although light work would have been beneficial for him. I find also the respondent was acting in good faith in not providing further work for the libelant at the time; and some part of the condition of libelant's arm is due to lack of sufficient and proper exercise which it would have been better if he had undertaken promptly, but which may now still be resorted to with benefit. I also find that libelant's continued failure to find employment was not due primarily to the condition of his arm but due to prevailing economic conditions. I also find that the medical advice given to the libelant was reasonable and should have been adequate, although probably, as he is an illiterate man, he may not have understood what he should have done in the way of aftertreatment by his own activities; and it would have been better if even greater care had been taken to impress upon him the importance of personal attention to his arm.

On November 28, when the insurance carrier made the first weekly payment to the libelant, he was asked to and did sign what in form is a complete release to the Arundel Corporation against all claims on account of injuries for the accident of November 18, 1931. This he signed by making his mark. And again on January 9, 1932, when the last payment was made to him, he signed a similar release. With commendable candor respondent's counsel abandons the contention set up in the answer to the libel that these releases constitute a bar to the libelant's claim. This accords with my own view, considering the illiteracy of the libelant and the conditions under which the release was signed. While no doubt the release was read to him and possibly explained in a general way, it is doubtful indeed if he realized the significance of the paper, being unrepresented by counsel and, as he expressed it, "not wishing to go against the company." The Henry S. Grove (D. C. Md.) 22 F.(2d) 444; The Adonis, 38 F.(2d) 743 (C. C. A. 3); McCahan Sugar Ref. & Molasses Co. v. Stoffel, 41 F.(2d) 651 (C. C. A. 3).

The theory of liability is that the employer furnished an unsafe place for the employee to work, and therefore the dredge was unseaworthy. A plat of the fireroom of the dredge as drawn by a marine surveyor, testifying as a witness for the libelant, was introduced into evidence. It shows two fire doors under the boiler, one on the starboard and one on the port side of the ship. The depth of the fire box was 6 feet. There is no contention that the premises were unsafe with respect to the starboard side, but the accident occurred on the port side where the distance from the fire door directly backwards to the cylinder of the anchor winch above referred to, is 70½ inches. This cylinder is a boxlike structure extending upwards from the floor about 2½ to 3 feet. Working room for the fireman is further restricted by the presence of an athwartship beam running along the ceiling or upper part of the fire room parallel with the face of the boiler and about 4½ feet from the floor and 4 feet from the boiler.

The hull of the dredge had been built possibly 50 years ago. New boilers were installed in 1913. Structurally there had been no change since then in the fireroom. The captain of the dredge testified that he was generally familiar with the conditions and that for a period of nine years or more there had been no change and that although numerous firemen had been employed in the room, there had been no complaints made of its insufficiency or inadequacy and no prior trouble or accidents had developed there. The libelant himself had worked there without difficulty for a period of four months prior to the accident. Other firemen testified that they had also worked there for various periods of time without difficulty although one of them, testifying for the libelant, said he had on several occasions lightly struck his arm against the cylinder box.

Under these conditions, I am unable to find as a fact that the premises were unsafe and that the dredge in this respect was unseaworthy. While the space afforded to the firemen for working the port side fire box was undoubtedly restricted and possibly inconvenient, I think it is unwarranted to say that the place was unsafe. This was not so in any ordinary use of the term as applied to similar situations. There was no latent defect in the premises or appliances. The libelant was thoroughly familiar with the conditions and his injury was not occasioned by any sudden change in the fixed property or appliances, but by the purely accidental fact that a combination of the roll of the boat and the sudden breaking up of the clinker caused him to lose his balance and fall backward thus striking his arm against the cylinder box. The mere presence of the box at that place did not render the place unsafe or the dredge unseaworthy although it did, in the particular case, result in the libelant's injury. If the box had not been there it is possible the

libelant would have sustained even a greater injury by falling completely to the floor.

But libelant's counsel submits a finer argument as applicable to all the conditions. He contends that the alleged unsafety of the place was due to a combination of the fixed physical conditions plus the instruments furnished by the employer to the fireman for his work. He here refers to the "slice bars," of which there were two, one about 8½ feet long and the other about 5 feet long. The libelant at the time of his accident was using the longer bar and by virtue of its length was apparently quite close to the cylinder box at the time. The depth of the fire box is 6 feet and, therefore, to completely and efficiently break up the coal or clinkers in the back portion of the fire box, a slice bar of 8 feet in length is none too long, especially as some portion of it must be outside the fire box in its practical handling. And it is quite obvious that if a slice bar of this length is used to break up that portion of the fire which is within 2 feet of the fire door, the fireman would have an awkward situation by reason of his necessary proximity to the cylinder box which is only about 6 feet from the fire box door. And it is this combination which libelant's counsel contends made the situation dangerous for the fireman. But the answer is also obvious. While the longer slice bar was necessary to reach the fire in the very back of the fire box, the shorter slice bar was available for work in the forward part of the fire box. So that there was no necessity for the libelant to have used the longer slice bar to agitate the coal in the forward part of the box. Presumably slice bars of the two lengths were furnished for this very purpose of alternate use here indicated.

■ The obligation of the shipowner is only to provide a *reasonably safe* place for the seaman to work in order to make the ship seaworthy in this respect. The shipowner is not an *insurer* of the safety of the premises. Burton v. Greig, 271 F. 271 (C. C. A. 5); The Henry S. Grove (D. C.) 22 F.(2d) 444; 56 C. J. 1090.

I therefore find that the respondent did not fail in its duty to provide its employee with a reasonably safe place for his work. See Skolar v. Lehigh Valley R. R., 60 F.(2d) 893 (C. C. A. 2), for a like conclusion in a somewhat similar case.

■ But libelant's counsel contend further that entirely apart from negligence the libelant is entitled to "maintenance and cure" by the employer; and that in this case he was not given the full measure of mainte-nance and cure to which he was reasonably entitled; and furthermore that any deficiency in maintenance and cure is recoverable in this proceeding.

And I conclude that libelant's contention in this respect is correct. Pacific S. S. Co. v. Peterson, 278 U. S. 130, 137, 49 S. Ct. 75, 73 L. Ed. 220; Skolar v. Lehigh Valley R. R., 60 F.(2d) 893 (C. C. A. 2); The Hanley, 29 F.(2d) 110 (C. C. A. 2); The Osceola, 189 U. S. 158, 23 S. Ct. 483, 47 L. Ed. 760; The Adonis, 38 F.(2d) 743 (C. C. A. 3); The Ipswich (D. C. Md.) 46 F.(2d) 136. I find also that the extent of "maintenance and cure" in this case was inadequate. The respondent's theory of the payments made to the libelant was, that as his case was not covered by the Maryland state law of workmen's compensation, and as the respondent was not legally liable for any negligence, nevertheless voluntarily it would pay the libelant what it considered he would have received under the Maryland Workmen's Compensation Law (Code Pub. Gen. Laws Md. 1924, and Supp. 1929, art. 101); that is, two-thirds of his weekly wages prior to the accident, during the period of his forced unemployment due to the accident. Its obligation was to furnish him "maintenance and cure." Ordinarily on shipboard a member of the crew is entitled to medical treatment and maintenance and wages on the boat at least until she reaches port, and maintenance and cure thereafter "until he is cured, or until he is cured so far as possible." The Bouker No. 2 (C. C. A.) 241 F. 831, certiorari denied, Jones v. Bouker Contracting Co., 245 U. S. 647, 38 S. Ct. 9, 62 L. Ed. 529; 56 C. J. 1071. The libelant's bare living expenses in maintaining himself on shore after the accident were $11 a week, slightly more than the weekly payment that he received. The total payments made to him aggregated $75.70. At the end of seven weeks the insurance carrier discharged him as *completely* cured. But I find that he was not in fact completely cured at that time. While the broken bone had reunited there was still a considerable period of time, I find, in which he should have had only light work to do. It is doubtful indeed if he would have been able to find light work at adequate compensation equivalent to full maintenance and cure, except from the employer in whose service the accident occurred. After he reported for light work the employer had none to give him. Under these circumstances I think the respondent did not discharge its full duty with respect to maintenance and cure to the libelant. See Skolar v. Lehigh

Valley R. R., 60 F.(2d) 893 (C. C. A. 2). In my opinion he is, therefore, entitled to some additional sum on this account. In matters of this kind I think the employee is entitled to fair and liberal treatment from the employer or, in other words, that maintenance and cure should be given liberally to the end that during the period of his disability the injured employee is not only maintained but that he is cured as far as possible. I therefore fix the further allowance in this case at $250. A decree to this effect with costs against the respondent will be signed upon presentation.