**JONES v. LYKES BROS. S. S. CO., Inc.**

United States District Court
S. D. New York.
Nov. 21, 1952.

Silas Blake Axtell, New York City (David D. Erroll, New York City, of counsel), for plaintiff.

Tompkins, Boal & Tompkins, New York City (Arthur M. Boal, New York City, of counsel), for defendant.

MURPHY, District Judge.

Plaintiff, a 52 year old seaman, brings this action for negligence under the Jones Act, 46 U.S.C.A. § 688, for indemnity because of unseaworthiness, and for maintenance and cure all because of an assault upon him by a fellow seaman on board the S. S. Frederick Lykes on May 25, 1949.

On the basis of the pleadings, testimony and exhibits, I make the following:

### Findings of Fact

1. The plaintiff has been a seaman for 32 years and signed articles on the defendant's S. S. Frederick Lykes at Houston, Texas, for a foreign voyage to the Far East which consumed about four months' time.

2. Aboard ship he shared quarters with two fellow seamen, including Hunter, his assailant. Through the entire course of the voyage to the Far East and return there was no trouble between plaintiff and Hunter. In fact plaintiff described their relationship as "friendly." There was testimony, however, that on a single occasion in the Philippines Hunter had an argument with a fellow crew member but no blows were struck by either.

3. On the evening of the assault, May 25, 1949, when the ship had returned to Galveston, Texas, plaintiff and Hunter had a can of beer together ashore and left each other under amicable circumstances. Plaintiff returned to the ship and went to sleep since his watch did not begin until 12 midnight. He reported for duty in the fireroom of the S. S. Frederick Lykes at a few minutes before midnight. Hunter, who had the 8 to 12 watch in the same fireroom, told him everything was in order and left, presumably for his quarters.

4. Plaintiff did not find everything in order. There were no notations on the blackboard concerning the tips in the burner and some oil had been spilled on the deck. The ship was being maneuvered to go upstream to Houston. Plaintiff inquired of the junior engineer what size tips Hunter had used and got no satisfactory response.

5. A few minutes later Hunter returned to the fireroom and shouted some vile remarks at plaintiff. Hunter told plaintiff that he had been firing long enough to know where things were. This argument was broken up by the chief engineer, who told Hunter to go back to his quarters. No blows were struck—in fact there was no physical contact at all.

6. Later that same morning after the plaintiff had completed his watch and returned to his quarters he was suddenly and without provocation beaten by Hunter. As a result plaintiff sustained severe injuries to his hip. These injuries caused plaintiff to be conveyed by ambulance that day to a hospital in Houston and from there to the Marine Hospital in Galveston.

7. Plaintiff was confined to the United States Marine Hospital in Galveston from May 25 to July 19, 1949, and from there removed to the United States Marine Hospital at New Orleans where he stayed from July 19 for a period of two months and three weeks and then continued as an outpatient until November, 1950.

8. Plaintiff's discharge papers show that he had been on The Frederick Lykes from February 2, 1949 to May 25, 1949.

9. Plaintiff shipped again, this time as a saloon-pantryman from August 4, 1950 to September 3, 1950, on the S. S. Howell Lykes and again from March 26, 1951 to July 6, 1951, as a fireman on the S. S. Lone Star State. On this last voyage plaintiff had to remain confined to his bed from Gibralter to Baltimore, a period of 16 days.

10. When plaintiff arrived in Baltimore on July 6, 1951, he went to the United States Marine Hospital in Baltimore for two weeks. He then came to New York and was admitted to the United States Marine Hospital on Staten Island on October 7, 1951, and was confined there until December 13, 1951. He has not worked since.

11. The injuries that plaintiff sustained consisted of a fracture of the neck of the right femur. A pin placed through the

femur to keep that bone in place was subsequently removed. Later the shaft of the femur was broken by surgeons in order to align it better. At that time a metal plate was placed in the femur, which remains to the present. Plaintiff walks with the aid of a cane and is presently suffering pain.

12. It was stipulated that maintenance and cure should be computed at the rate of $6 per day.

### Discussion

Two questions relating to separate theories of defendant owner's liability are presented, *viz.*, whether or not (I) the owner was negligent; and (II) the ship was unseaworthy because of Hunter's employment.

■ With respect to the first question, there is no evidence that the shipowner was aware of any propensity of Hunter's to assault fellow employees, either at the time Hunter was hired or at any other time prior to the assault on the plaintiff. It is of course possible to have negligent conduct with respect to the employment of a dangerous seaman without proof of actual knowledge by the defendant of such seaman's violent tendencies. Not all risks of harm actionable on a theory of negligence need be created advertently. If the risk of an assault upon another seaman created by hiring or retaining Hunter was of sufficient magnitude to cause an ordinary man of reasonable prudence to investigate Hunter's propensities, then the employment of Hunter without such investigation would be negligent. In this case however there is no evidence of any appreciable probability of such assault by hiring or retaining Hunter. Consequently, in the absence of an awareness by defendant of vicious tendencies in their employee and the absence of any evidence which would cause a reasonable man of ordinary prudence to investigate further for such tendencies, there cannot be said to be "negligence imputable to an employer" under the Jones Act, 41 Stat. 1007, 46 U.S.C.A. § 688 et seq.

The second and more involved question is whether—apart from negligence—plaintiff has a cause of action for breach of the owner's duty to provide a seaworthy ship. The origin of this right is somewhat speculative; it is probably traceable to an undated privilege of a sailor to abandon his vessel if it was unseaworthy. The Arizona v. Anelich, 298 U.S. 110, 121 note 2, 56 S. Ct. 707, 80 L.Ed. 1075; Mahnich v. Southern S. S. Co., 321 U.S. 96, 99, 64 S.Ct. 455, 88 L.Ed. 561; But cf. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 91 note 7, 66 S.Ct. 872, 90 L.Ed. 1099. For many years after the right had become entrenched in American admirality with the opinion of Mr. Justice Brown in The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, it had been supposed that fault was the basis of a shipowner's liability. See The Tawmie, 5 Cir., 80 F.2d 792; The Cricket, 9 Cir., 71 F.2d 61; Burton v. Greig, 5 Cir., 271 F. 271; Kahyis v. Arundel Corp., D.C.Md., 3 F. Supp. 492. This notion diminished with the progression of cases in our highest court so that assumption of risk, Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 428–429, 59 S.Ct. 262, 83 L.Ed. 265, and then contributory negligence of another, Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561, vanished as defenses. Later the Supreme Court flatly announced the basis of liability in Seas Shipping Co. v. Sieracki, 328 U.S. 85 at page 94, 66 S.Ct. 872 at page 877, 90 L.Ed. 1099:

> "These and other considerations arising from the hazards which maritime service places upon men who perform it, rather than any consensual basis of responsibility, have been the paramount influences dictating the shipowner's liability for unseaworthiness as well as its absolute character. It is essentially a species of liability without fault, analogous to other well known instances in our law."

Transposition of the action for breach of seaworthiness from defects in the inanimate hull and gear of the ship to animated ones in the seamanship and disposition of its crew was no doubt facilitated by proof of shipowner's fault in the early cases of both sorts. In In re Pacific Mail S. S. Co., 9 Cir., 130 F. 76, 69 L.R.A. 71, the shipowner was held liable for loss of lives of passengers and one crew member as well because inability of the officers to communi-

cate with the Chinese-speaking crew made the crew unfit and the ship unseaworthy. In The Rolph, 9 Cir., 299 F. 52, a seaman's recovery for an assault at the hands of a particularly brutal mate was based upon unseaworthiness. The court noted that "the mate is a man known to be of a most brutal and inhuman nature, one known to give vent to a wicked disposition". Id., 299 F. at page 55. Obviously, there was no problem of negligence in these cases since the risks—unjustifiable and great—were also created advertently. Earlier this year in Keen v. Overseas Tankship Corp., 194 F.2d 515, the Court of Appeals in this circuit, in reversing a judgment by the court below for excluding evidence of temperamental unfitness of a seaman who assaulted another, because unknown to defendant, held that such knowledge was not necessary to maintain an action for unseaworthiness. "We can see no reason for saying that, although the owner is liable if the ship's plates are started without his knowledge, he is not liable if he signs on a homicidal paranoiac, whose appearance does not betray his disposition." Id., 194 F.2d at page 518, per Hand, L., Ct. J. There was evidence in that case that the pugnacious seaman, a second cook who chose a meat cleaver to fell the plaintiff, had been drunken, dirty, quarrelsome and habitually in possession of dangerous weapons. But the language of the court makes clear that negligence in hiring or retaining the sadistic second cook was not the basis of the owner's liability, no matter how inadvertent the owner may have been in creating the risk. Referring to "the warranty of seaworthiness * * * in favor of seamen * * * that * * * extends to unknown defects", the court said, Id., 194 F.2d at page 518:

"* * * we can see no antecedent reason to assume that after the owner has used due care in selecting the crew, they will in many instances turn out not to be up to the ordinary measure of the calling. But suppose there will be many such instances; that is no reason why an individual seaman who has suffered because his fellow is not up to his work, must bear the loss. Substan-

tially all maritime risks are insured, and if we must suppose that the addition of this risk will show in the premiums, in the end it will be likely also to show in freight rates; and so far as it does, the recovery will be spread among those who use the ships. * * *"

So it is clear that the basis of liability without fault, announced in the Sieracki case, supra, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, is as applicable to seamen as to ship. The only question posed by the instant case is whether the doctrine has limits, and if so whether or not the plaintiff's injuries fall within them. In the Keen case, supra, 194 F.2d at page 518, the court said:

"Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling."

We would suppose such "warranty" would then not cover all injuries sustained by a seaman at the hands of a fellow crew member. Presumably, a justified battery, e.g., one in lawful self-defense or in defense of others, would not indicate that the seaman inflicting the injury was not "equal in disposition * * * to the ordinary men in the calling." Perhaps also outside the limits of this doctrine might fall the case of an assault unjustified yet sufficiently provoked. At common law, for example, an intentional killing might be unjustified and hence criminal but nevertheless if it were committed in the heat of passion upon sufficient provocation, the crime would amount to voluntary manslaughter, and not murder. And the test of the sufficiency of provocation was whether an ordinary man would have been induced to lose his self control. See Regina v. Welsh, 11 Cox Cr. Cas. 336; Holmes, the Common Law, 61. But neither the situation of a justified or sufficiently provoked intentional battery are presented by the evidence in this case. And the evidence being uncontradicted that plaintiff's injuries were intentionally caused by the blows of Hunter, a fellow seaman,

the plaintiff may recover for breach of seaworthiness.

### Conclusions of Law

1. The plaintiff has failed to prove negligence on the part of the defendant and the complaint in this regard should be dismissed.

2. Because of the assault and battery on the plaintiff by Hunter the plaintiff is entitled to be indemnified for the defendant's breach of its warranty of seaworthiness in the sum of $15,000.

3. The plaintiff is entitled to recover on his second cause of action for maintenance and cure the sum of $3,672.