## BOUDOIN v. LYKES BROS. S. S. CO., Inc.
### No. 3532.

United States District Court
E. D. Louisiana, New Orleans Division.
May 14, 1953.

Raymond H. Kierr and Samuel C. Gainsburgh, New Orleans, La., for plaintiff.

Terriberry, Young, Rault & Carroll, Andrew R. Martinez and William E. Wright, New Orleans, La., for defendant.

WRIGHT, District Judge.

Plaintiff, an American seaman, is suing the defendant as the owner and operator of an ocean freighter known as the Mason Lykes, on which vessel he was formerly employed. Plaintiff claims to have been assaulted by a fellow seaman aboard the vessel and bases his claim for recovery on allegations of negligence and unseaworthiness. The issues of fact and law having come on to be heard on the pleadings and proofs of the parties and due deliberation having been had, the court now makes the following findings of fact and conclusions of law:

### Findings of Fact

1. Plaintiff was employed aboard this vessel in the engine department in the ca-

pacity of oiler during a foreign voyage which commenced from and ended in New Orleans between the dates of September 6, 1949 and December 19, 1949. He received wages and overtime amounting to about $300.00 per month. During the same voyage the defendant also employed a deck-maintenanceman named Manuel Gonzales.

2. There occurred an "assault upon the person of Elie J. Boudoin, oiler, by Manuel Gonzales, deck-maintenance, on November 25, 1949, aboard ship at Walvis Bay, S. W. A.", and an entry to said effect was made in the official log book of the vessel.

3. A drinking party took place aboard the vessel during the late hours of November 24, 1949 and the early hours of November 25, 1949 in the living quarters of boatswain, Robert Oswald, and the deck-maintenanceman, Jacob Pali, which was attended by them and Manuel Gonzales.

4. The master and other officers were aboard the vessel while the drinking party was in progress in the boatswain's forecastle, and one of the officers was charged with being awake and having the watch duty, which watch duty included the hourly inspection of crew's quarters. The master and other officers of the vessel did nothing to terminate the drinking party in spite of the fact it was a violation of shipboard regulations to bring aboard ship or to consume aboard ship spiritous liquors.

5. During the course of the party a large quantity of liquor was consumed. Each of the principals at the party, namely, the boatswain, Gonzales and the deck-maintenanceman drank almost a full fifth of whiskey. A few drinks were consumed by other members of the crew who dropped in on the party.

6. The plaintiff had retired to bed in his quarters about 5:00 p. m. on November 24, 1949. He slept until about 1:30 the following morning, at which time he got up and went to the mess hall for a sandwich. On his way back to his own room the plaintiff passed the boatswain's room where he was offered a drink. He refused the offer and returned to his room.

7. Between 15 and 30 minutes later, while plaintiff was asleep or almost asleep in his bed, Manuel Gonzales came into the plaintiff's room and took a bottle of brandy from under the plaintiff's bed. When plaintiff was startled in the semi-darkness by the shape and person of Manuel Gonzales close at his bed, the plaintiff accosted the intruder, and Gonzales attacked the plaintiff, striking him on the back of the head with the bottle which he, Gonzales, had taken from under the plaintiff's bed.

8. Manuel Gonzales was in a drunken and disorderly condition when he intruded into plaintiff's room shortly before 2:00 a. m. for the apparent purpose of stealing a bottle of liquor.

9. A few minutes after Gonzales struck plaintiff with the bottle Gonzales appeared in the passageway in the vicinity of plaintiff's room with a large knife which he intended to use on the plaintiff. The knife was taken from him by Andrew Brown, fireman-water tender and roommate of the plaintiff and Harry Brock, third mate of the vessel.

10. As a result of the blow which was struck by Manuel Gonzales, which blow caused his weapon, the full bottle of liquor, to break upon the plaintiff's head, the plaintiff sustained concussion and lacerations. The plaintiff received medical treatment from a doctor who was a passenger aboard the vessel. The treatment included the tieing off of severed blood vessels, the placing of 18 stitches in the deep cuts at the back of the plaintiff's head and cauterization of the wounds.

11. While the plaintiff was receiving medical treatment in the ship's hospital, Manuel Gonzales was outside the hospital door creating a disturbance. During that time, which was shortly after the assault, Manuel Gonzales stated that he was responsible for the plaintiff's condition, and that he wanted to give some of his blood for a transfusion. He called epithets into the sick-bay at the plaintiff. He refused to permit the mate on watch, Mr. Brock, to enter the room and threatened him with bodily injury.

12. About 8:00 a. m. on November 25, 1949, Manuel Gonzales was ordered to the master's cabin and there refused to make a

statement relative to his affair with the plaintiff, and also refused his signature to the effect that he would not make a statement.

13. Thereafter Manuel Gonzales was sent to the ship's hospital to clean it, and, instead of completing the job, he left the vessel against orders.

14. About 1:00 p. m. on November 25, 1949, Manuel Gonzales returned to the vessel with two bottles of liquor, at which time the master apprehended him, took the bottles away, and placed him in irons. At the same time the master requested the shore police to take Manuel Gonzales into custody for safekeeping until the vessel sailed. The police declined to do so unless he was left behind for a court hearing several days later.

15. Manuel Gonzales was logged for failing to obey orders, and the master ordered that he pay all overtime necessary while the plaintiff was relieved from duty.

16. On the morning of November 26, 1949, Manuel Gonzales left the vessel without leave and did not return until the morning of November 28, 1949; he was logged for disobedience of orders; the master further ordered that Manuel Gonzales should be charged with the costs of transportation to and from the hospital and for x-rays.

17. On December 7, 1949 there was imposed on Manuel Gonzales the following fines: two days' pay for being absent without leave on November 26, 1949 and November 27, 1949; four days' pay for disobedience of orders in leaving ship after shore leave denied at Walvis Bay.

18. On the return of the Mason Lykes to the United States Manuel Gonzales was fired by the captain. Since that time, however, he has sailed aboard several of defendant's vessels, including one at the time of trial.

19. Manuel Gonzales was a person of dangerous propensities and proclivities during the time he was employed aboard the Steamship Mason Lykes, including the time of his assault upon the plaintiff and prior thereto.

20. Manuel Gonzales was a person of violent character, belligerent disposition, excessive drinking habits, disposed to fighting and making threats and assaults.

21. Following his injuries, plaintiff was relieved from duties during the remainder of the voyage and remained under medical observation and treatment aboard the vessel. During that time he suffered from occasional headaches and dizziness and was administered medicine at intervals to ease pain, all as noted by the master in his statement attached to log entries.

22. Plaintiff was admitted to the United States Marine Hospital in New Orleans as an outpatient on December 19, 1949, and as a hospital patient on February 15, 1950. He was discharged as fit for duty on February 21, 1950. The diagnosis included healed scars of the posterior head and post-traumatic headaches. The plaintiff was also examined by private physicians. There was no treatment for his complaints other than rest and medication to relieve headaches.

23. The plaintiff did not return to work until August, 1950, when he obtained a job with the Municipal Sanitation Department, which he kept for about five months. Later the plaintiff returned to his occupation as a merchant seaman. He made two sea voyages during 1951, one for two months and the other for four months, and a third and final sea voyage during 1952 for a period of one month.

24. The plaintiff testified that he has stopped going to sea because he is unable to perform his duties properly and comfortably. He complains that his headaches, dizziness and nervousness are increased and made worse by heavy labor and confinement aboard ship, the movement of the vessel at sea, and the heated surroundings in the engine-room.

25. The medical evidence supports the plaintiff's testimony to the extent that some neurological tests applied to the plaintiff have been positive, indicating brain damage of some kind. Plaintiff has failed to prove, however, to a reasonable certainty that the assault on him by Manuel Gonzales is responsible for his neurological condition.

26. The plaintiff received from the defendant maintenance at the rate of $6.00 per day covering a period of 43 days from December 20, 1949 to January 31, 1950, representing a total of $258.00. As a result of his injuries received aboard the Mason Lykes, however, he was not fit for duty until February 21, 1950.

### Conclusions of Law

1. Jurisdiction of this action is properly laid under the Jones Act, 46 U.S.C.A. § 688, and the general maritime law.

2. The warranty of seaworthiness is a kind of liability without fault in which knowledge of the circumstances creating the unseaworthiness is immaterial. Seas Shipping Company v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Work v. Leathers, 97 U.S. 379, 24 L.Ed. 1012; The Edwin I. Morrison, 153 U.S. 199, 210, 14 S.Ct. 823, 38 L.Ed. 688; Mahnich v. Southern S. S. Co., 321 U.S. 96, 100, 64 S.Ct. 455, 88 L.Ed. 561; The H. A. Scandrett, 2 Cir., 87 F.2d 708, 710; Balado v. Lykes Bros. S. S. Co., 2 Cir., 179 F.2d 943, 945.

3. A shipowner's warranty of seaworthiness covers the competence of the crew as well as the integrity of the vessel. The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760; In re Pacific Mail Steamship Company, 9 Cir., 130 F. 76, 69 L.R.A. 71; The Rolph, 9 Cir., 299 F. 52; Spellman v. American Barge Line, 3 Cir., 176 F.2d 716; Keen v. Overseas Tankship Corp., 2 Cir., 194 F.2d 515.

4. Applied to a seaman, such a warranty is not that the seaman is competent to meet all contingencies, but that he is equal in disposition and seamanship to the ordinary men in the calling. Keen v. Overseas Tankship Corporation, supra.

5. Manuel Gonzales was during the voyage in question not equal in disposition and seamanship to the ordinary men in the calling of seamen and his shortcoming in this regard was a proximate cause of plaintiff's injuries.

6. It is the duty of officers of a vessel to maintain proper discipline among the crew and, particularly, to suppress those disorderly acts of seamen which may rea-

sonably be expected to result in injury to members of the crew. Jensen v. United States, 3 Cir., 184 F.2d 72, 1950 A.M.C. 1797; Koehler v. Presque-Isle Transportation Company, 2 Cir., 141 F.2d 490, 1944 A.M.C. 432.

7. The failure of the officers of the vessel to suppress the seamen's drinking party aboard ship which they knew or should have known had been going on for several hours and which they should have anticipated might lead to an assault by one seaman on another is negligence for which the defendant is liable under the Jones Act.

8. As a result of its breach of warranty of seaworthiness and the negligence of its officers, the defendant is liable to the plaintiff in the amount of $1500 for his injuries and $600 for loss of wages. In addition, the plaintiff is entitled to maintenance from February 1, 1950 to February 21, 1950.