Ruth HOLLEY, Administratrix of the Estate of Edward J. Holley, deceased, Libellant,

v.

Steamship THE MANFRED STANSFIELD, her engines, boilers, etc., in rem and Reederei Blumenfeld, G.M.B.H., in personam, Respondents.

REEDEREI BLUMENFELD, G.M.B.H., Petitioner,

v.

Joseph C. JETT, Respondent-Impleaded.

Joseph C. JETT and Reederei Blumenfeld, G.M.B.H., Petitioners,

v.

ELIZABETH RIVER TERMINALS, INC., Respondent-Impleaded.

ELIZABETH RIVER TERMINALS, INC., Petitioner,

v.

F. S. ROYSTER GUANO COMPANY, INC., Respondent-Impleaded.

No. 7802.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 25, 1958.

Louis B. Fine and Howard Legum, Norfolk, Va., for Libellant.

Walter B. Martin, Jr., Norfolk, Va., for the Manfred Stansfield and Reederei Blumenfeld, G.M.B.H.

R. Arthur Jett and Roy L. Sykes, Norfolk, Va., for Joseph C. Jett.

Jack E. Greer, Norfolk, Va., for Elizabeth River Terminals.

L. S. Parsons and George P. Hylton, Jr., Norfolk, Va., for Royster Guano.

**WALTER E. HOFFMAN, District Judge.**

Libellant's decedent, a longshoreman employed by Elizabeth River Terminals, Inc., died as a result of injuries sustained on September 17, 1956, in the No. 2 hold of the S. S. Manfred Stansfield, a German vessel owned by Reederei Blumenfeld, G.M.B.H., and chartered to Joseph C. Jett, when a large block of solidified muriated potash fell upon decedent while he was operating a "payloader" in the hold. The amended libel filed against the vessel and its owners alleges negligence in failing to furnish decedent with a safe place in which to work, as well as unseaworthiness of the vessel. By virtue of the provisions of the Virginia Death by Wrongful Act statute, § 8–633, Code of Virginia, 1950, as amended, a recovery to the extent limited therein is sought. The respondent-owner impleaded Joseph C. Jett, the charterer, who, in turn, impleaded Elizabeth River Terminals, Inc., the stevedore whose services were engaged in unloading the vessel at South Norfolk and for whom the decedent was working at the time of the accident. The respondent-owner thereafter impleaded the stevedore upon the theory of implied contract. The stevedore, Elizabeth River Terminals, Inc., impleaded F. S. Royster Guano Company, Inc., at whose place of business in Baltimore, Maryland, approximately one-half of the cargo had previously been unloaded a few days prior to the accident, and who allegedly failed to provide for the trimming of the cargo prior to the vessel's leaving Baltimore for Norfolk. Holding that no contractual relationship existed between the stevedore and Royster, the action for indemnity over against Royster was dismissed at the conclusion of the evidence.

The vessel was loaded with potash and the cargo trimmed at Hamburg, Germany. The cargo thereafter belonged to the charterer, Jett. By arrangement with Royster, the ship docked at Royster's Baltimore dock on September 6, 1956; the cargo having been sold by Jett to Royster "alongside the dock". Royster thereupon employed Rucker Terminals, an experienced stevedore in Baltimore, to unload its portion of the cargo. By reason of the hydroscopic nature of the cargo, the potash settled during the voyage, thus forming a mass which in places was exceedingly hard and resembled concrete. The evidence discloses that differences of opinion exist with respect to the safest and best methods used in the trade to unload a

cargo of partially solidified muriated potash. Some stevedores use dynamite, while others employ air hammers, picks and shovels for the purpose of loosening the cargo and loading the grab of the crane. Either method apparently is accepted, although there is some feeling that dynamite may endanger the safety of the ship. When the cargo is substantially removed from the square of the hatch, a device known as a "payloader" is lowered into the hold to collect the loose material and load into the clam shell or grab. The "payloader" is a small bulldozer with a scoop in front and it is frequently used by operators to assist in breaking the solid mass, although such practice is frowned upon by experienced stevedores because of the dangers incident thereto when an "overhang" is formed.

At Baltimore there was no consideration given to the use of dynamite and the testimony reflects that an explosive of this type is never used at that port unless the hold is rendered too dangerous to enter by the longshoremen. The method of unloading employed at this first port of call consisted of the use of a crane with a grab similar to a clam shell. To break up the cargo the longshoremen used air hammers, picks and shovels. A portion of the cargo was removed from each of the holds and it is reasonable to assume that the greater part thereof was taken from the square of the hatches. According to a witness from Rucker Terminal, the No. 2 hold had been dug a depth of 12 feet and approximately 6 feet in the wings, leaving the remaining cargo on an estimated 30 degree incline. This witness testified that the stevedore never trimmed the cargo unless directed to do so by the master or first officer, except for the purpose of loading other cargo on the top thereof. No other cargo was loaded at Baltimore and there is no evidence indicating that Rucker was instructed to trim the same.

Following unloading operations in Baltimore, the vessel proceeded to South Norfolk, Virginia, where she arrived and commenced unloading the balance of her cargo on September 13, 1956. Upon arrival it was noted that the potash had been substantially removed from the square of the No. 2 hatch, but there remained a large quantity fore and aft the square of the hatch, as well as in the wings where the potash was from 12 to 20 feet in height. Recognizing the difficulties to be encountered in removing the cargo, the stevedore's superintendent requested permission of the master and first officer to use small charges of dynamite but this request was denied. Thereupon the stevedore used the same methods employed at Baltimore, aided by the use of "payloaders" as the cargo had been sufficiently removed from the floor of the vessel to enable the equipment to operate. The No. 2 and No. 3 hatches may be considered as one, being separated only by a center line partition running lengthwise the vessel, with no bulkhead athwartships. As the unloading operations continued in these hatches on September 14, a corridor under the center line partition was created by the stevedore, and it was in this corridor that decedent met with the fatal accident while operating the "payloader" on Monday, September 17, following a weekend layoff of activities. At the time in question the port side had been completely unloaded and the longshoremen were in the process of unloading the starboard side.

The testimony reveals that the operators of "payloaders", including the decedent, were warned of the dangers created by "digging a cave", although it is generally conceded that there existed, on the occasion in question, a "slight overhang" caused by the action of the "payloader" in cutting under the potash. The decedent had been hitting the potash just prior to the accident when the "overhang", consisting of a block approximately 4 feet square, fell upon him and overturned the equipment. The extent of the "overhang" is not apparent from the evidence, but, as no men were engaged in work on the

top side of the cargo, it is fair to assume that any "overhang" created was due to the acts of decedent in operating the "payloader", a piece of equipment brought aboard by the stevedore and not considered as a part of the ship's normal equipment.

From the time the vessel arrived at South Norfolk it is undoubtedly true that the condition in the area had materially changed by reason of the unloading operations conducted for a period of two and one-half days. Where the decedent was fatally injured was fully loaded with potash when the ship docked. It is estimated that approximately 20 hours had been required in unloading the No. 2–3 hatches prior to the accident, and approximately 28 hours additional were needed to complete unloading operations in these combined areas. When the accident occurred, the potash was still 12 to 15 feet high along the starboard side of the vessel where decedent was working, with a corridor approximately 20 feet in width running from the No. 2 hold to the No. 3 hold having been cleared to aid in the operation of the "payloaders".

Assuming arguendo that the vessel was in an unseaworthy condition upon arrival at South Norfolk by reason of the failure to trim the cargo after discharge at Baltimore, we are not impressed by libellant's contention that such failure was a proximate cause of the fatal accident. It is urged that if dynamite had been used as requested by the stevedore, the cargo would have been trimmed and the accident would not have resulted. Proper stowage is, of course, an element of seaworthiness, but it is only one element and we do not conclude that an owner or charterer having engaged the services of an expert stevedore, should be held accountable for the consequences of a fatal accident, where the condition existing at the time of the accident bears no reasonable relationship to the condition present when the vessel arrived in an allegedly unseaworthy state. If there existed an unseaworthy condition at the

time of the accident, it was brought about by the action of the expert stevedore and, more especially, by the decedent himself who was highly regarded as an experienced operator of the "payloader". Nor are we of the opinion that the respondent-owner was negligent in failing to provide the decedent with a reasonably safe place in which to work where the unsafe condition was attributable to the acts of the stevedore and the decedent. To hold otherwise would make the shipowner an insurer of the safety of anyone lawfully on board the vessel, and subject to the ever changing conditions brought about by operations in loading and unloading cargo. We are not unmindful of the trend evidenced by recent decisions upholding recoveries predicated upon unseaworthiness, but we do not feel that the doctrine has been extended to the point of total disregard of the relative concept which should be considered. There is no contention that the longshoremen were incompetent. As was said in Berti v. Compagnie De Navigation Cyprien Fabre, 2 Cir., 213 F.2d 397, 400:

"If plaintiff's [a longshoreman] injuries resulted solely from the manner in which the work was done under [the stevedore's] supervision, he [the plaintiff] has no recourse against [the shipowner]."

We find it unnecessary, however, to determine this case on unseaworthiness or the failure to provide a safe place to work. At common law and under the General Maritime Law, there can be no recovery for death. The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Butler v. Boston & Savanah Steamship Co., 130 U.S. 537, 555, 9 S.Ct. 612, 32 L.Ed. 1017; Union Carbide Corp. v. Goett, 4 Cir., 256 F.2d 449. The sole right of recovery for death is found under the Jones Act, 46 U.S.C.A. § 688, or under the prevailing state statute permitting recovery for wrongful death. As decedent was not an employee of the respondent-owner, the Jones Act is inapplicable. Section 8–633 of the Code of Virginia, 1950, specifies

a remedy for wrongful death, but that remedy carries with it the burdens of the statute as interpreted by the highest court of the state. Thus it follows that, as contributory negligence is an absolute bar to a right of recovery in a death action in Virginia, the same rule must be applied by this Court sitting in admiralty. The usual rule providing that contributory negligence will only mitigate the damages is not applicable to a death action in Virginia under the circumstances presented herein. Continental Casualty Co. v. The Benny Skou, 4 Cir., 200 F.2d 246, 250, affirming, D.C., 101 F.Supp. 15; Klingseisen v. Costanzo Transp. Co., 3 Cir., 101 F.2d 902; Curtis v. A. Garcia Y Cia, 3 Cir., 241 F.2d 30; Hill v. Waterman Steamship Corp., 3 Cir., 251 F.2d 655; Benedict on Admiralty, 6th Ed., Vol. 1, pp. 391–394; Union Carbide Corp. v. Goett, supra, and authorities therein cited.

Manifestly one cannot escape the conclusion that decedent was guilty of contributory negligence which was a proximate cause of the accident. He is the one person who had full opportunity to observe the conditions under which he was operating the "payloader" in an effort to break up the nearly solid mass of cargo. He alone was working in the particular area which capsized. He alone was the one with knowledge as to the extent to which the "payloader" had been successful in causing an "overhang". His failure to take reasonable precautions for his own safety undeniably contributed to the accident.

For the reasons herein stated, we do not reach other questions raised by counsel during the trial. Proctors for the respondents will prepare an appropriate decree dismissing the libel with costs and, after presentation to proctors for the other parties in interest, present the same to the Court for entry.

In accordance with General Admiralty Rule 46½, 28 U.S.C.A., this opinion is adopted in lieu of specific findings of fact and conclusions of law.