Herman J. HOLMES, Appellant,

v.

MISSISSIPPI SHIPPING COMPANY, Inc., Appellee.

No. 18968.

United States Court of Appeals Fifth Circuit.

March 30, 1962.

Rehearing Denied May 22, 1962.

praise and adjudicate the value of attorneys' services in a case of this general character.

Samuel C. Gainsburgh, Raymond H. Kierr, New Orleans, La., for appellant.

Walter Carroll, Jr., Andrew R. Martinez, New Orleans, La., for appellee, Mississippi Shipping Co., Inc; Terriberry, Rault, Carroll, Martinez & Yancey, New Orleans, La., of counsel.

Before RIVES, CAMERON and BELL, Circuit Judges.

CAMERON, Circuit Judge.

Holmes, the libelant-appellant (hereinafter sometimes called Holmes), appeals from the order of the court below maintaining exceptions filed by respondent-appellee, Mississippi Shipping Company, Inc. (hereinafter sometimes called Mississippi), on the ground that the claim for damages contained in the amended libel did not aver facts sufficient to constitute a cause of action. Holmes states in his brief that the single question of law presented is: "Is a seaman entitled to recover damages for injuries caused by unseaworthiness of his former vessel, if the seaman himself constitutes the unseaworthiness?"

The libel originally filed asked for maintenance only, following Holmes' amputation of his right hand. After Mississippi had answered, an amended libel was filed supplementing the averments of the original libel and demanding damages in addition to maintenance. The ruling of the court below was based entirely upon these averments, pertinent portions of which are copied in the margin.[1]

Holmes caused to be placed in the record a statement purporting to be that of William Cornforth, Master of M/V Del Rio, dated December 10, 1954, portions of which are copied in the margin.[2] The

1. "On and prior to December 4, 1954, respondent employed libelant as a member of the crew of [the motor vessel Del Rio] in the capacity of steward's utilityman;

"On or about December 4, 1954, while the M/V DEL RIO was upon a foreign voyage, libelant became ill and disabled in that he suffered a mental and emotional breakdown, characterized as an acute schizophrenic reaction, during which time libelant inflicted physical injuries upon himself consisting of the amputation of his right hand; * * *

"At the time of libelant's aforesaid mental and emotional breakdown in the form of an acute schizophrenic reaction libelant was not equal in disposition, personality and/or temperament to the average man who follows the sea;

"Libelant's said deficiency in disposition, personality and/or temperament rendered the M/V 'Del Rio' unseaworthy;

"Libelant's aforesaid personal injuries in the form of the amputation of his right hand proximately resulted from the said unseaworthiness of the M/V 'Del Rio';

"At the time that libelant joined the crew of the M/V 'Del Rio' as a merchant seaman, respondent warranted unto libelant the seaworthiness of the said vessel in her hull, gear, appliances, appurtenances and crew;

"By reason of the foregoing and the breach of said warranty libelant is entitled to recover of respondent herein the damages which he has and will sustain by reason of his said personal injuries, * * * of the value of $50,-000.00."

2. "When this self-inflicted amputation of Holmes' happened he was asked by the Master how he had done it. Holmes answered that he had done it on purpose and that he 'had to do it.' He said, also, that he would tell the Master more about it later.

"On the morning of December 10, 1954, prior to arrival at Fort Gentil, Holmes * * * told the Master the following story:

"He said, first of all, that he did not intend to return to the United States, that he 'couldn't go back.' He went on to say that he had gone ashore in Takeradi, Gold Coast, on the last voyage the vessel made, and had gone to see a religious rite there (name not given). He mentioned that the reason he had gone there was because of trouble at home. What it was he didn't state.

"Holmes stated that he had consulted a certain person in Takeradi at that time (identity of person not given), and that this person had told him there were three things he must do before he could be 'straight.' Because of the fact that he had crossed the River Jordan it was too late to go back, and the only thing

statement was not attached as an exhibit to either libel, was not offered in evidence, and it is difficult to perceive any reason for its consideration by the court below in passing on the exception to the libels. No point is made of the matter by Mississippi, however, and we will give it such consideration as it deserves in passing upon the legal questions involved.

Appellant does not rely upon any legal precedent for the contention that self-inflicted injuries should be held to be the product of unseaworthiness of the vessel. Reliance is placed instead on what appellant refers to as "the underlying considerations and the philosophy of the maritime doctrine of seaworthiness of which Holmes seeks to avail himself." While he mentions a number of cases by the Supreme Court in which a tendency has been shown to expand the humanitarian doctrine of absolute liability in case of unseaworthiness, appellant relies chiefly upon the case of Boudoin v. Lykes Brothers Steamship Co., Inc., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354. Appellant conceives that the Supreme Court there affirmed liability for injuries inflicted on another seaman caused by personality

deficiencies of a crew member, and plainly held that there should be no distinction between the warranty of seaworthiness covering hull and gear and the warranty covering the men who handle both.

Appellant's attitude is epitomized in his brief in the quotations therefrom copied in the margin.[3] This frank expression by appellant's spokesman of his true attitude [as well as his statement in oral argument that Holmes is now back at work as a seaman] is commendable, but as far as we can see, his conclusion has no basis in either convincing authority or reason. A brief examination of the rationale of Boudoin will demonstrate that its holdings, while revolutionary were not without limitations. The District Court[4] concluded that the master and officers of the vessel there involved were negligent under the Jones Act in failing to anticipate that a drinking spree in the boatswain's forecastle might lead to an assault by one seaman on another. That court also held that the shipowner's warranty of seaworthiness covers the competence of the crew, as well as the integrity of the vessel, limiting the warranty, however, by these words borrowed

---

left for him to do was 'to read the 13th Chapter of Daniel', and then he was 'to cut off his right hand.' The second thing was 'to read 1 thru 13 chapters of Hebrews', and then he was to 'cut off the left leg at the knee.' Third, he 'had to read the Book of Revelations.' What he had to do after this, Holmes did not state. He said he 'could not go back after leaving Monrovia' because he had 'already crossed the line, and he couldn't go back.' After that, he 'had to perform the three acts in order to live for Jesus.'

"Holmes stated that he had had to administer three blows of the meat cleaver in order to effect the complete amputation of his right hand * * *

"Previous to the incident of the self-inflicted amputation of his right hand, there had been no signs of his contemplating such an act. Holmes had seemed perfectly normal, performing his work efficiently, up thru the last day * * *"

3. "It is submitted that the instant appeal should be decided just as though Holmes' injuries had been caused by the unseaworthiness of a hawser or a boom, or any *other* crew member.

"Appellee has not heretofore suggested, nor can it realistically do so now, that Holmes' injuries were the result of any *fault* or *neglect* on his *part*. Nor do we intimate at this time that any fault or negligence, or failure to use due diligence or care on the part of appellee caused or contributed either to appellant's mental disorder or to the grievous injuries which resulted therefrom.

"On the other hand, however, it cannot be said that the nature of appellant's calling, the itinerary of the vessel, appellant's racial and cultural background [his attorney stated in the oral argument that he is a Negro], superimposed upon the environment of shipboard life, are wholly irrelevant to his mental breakdown—to his unseaworthiness.

"It is at least probable that there is a causal connection between this unfortunate man's mental collapse and the rigors of the merchant service, the confinement among strangers indigenous to it, the exposure to foreign cultures, mores and ideologies, and the deprivations of a long ocean voyage."

4. 112 F.Supp. 177, 180.

from Judge Hand's decision in Keen v. Overseas Tankship Corp., 2 Cir., 1952, 194 F.2d 515: "Applied to a seaman, such a warranty is, not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to the ordinary men in the calling."

This Court reversed the District Court's finding of negligence and held also that, under the facts of the Boudoin case, the assault committed by the seaman on Boudoin could not be attributed to the unseaworthiness of the vessel, especially since the standard used by the District Judge under the teaching of Keen presented no reliable or workable measure for determining whether the mere presence on board of a particular seaman is a breach of the assumed warranty. We buttressed our conclusion that this was true by the fact that the Court of the Second Circuit—the same Judges sitting—rendered an opinion about one year after Keen, in which it reversed a finding of liability by a District Court based upon warranty of seaworthiness, growing out of facts to us indistinguishable from those presented in the Keen case.[5]

The Supreme Court granted certiorari and reversed our decision in Boudoin. Its basic holding was that there was evidence to support the findings by the District Court of breach of the warranty of seaworthiness. The concluding language of the opinion states some of the ingredients of the personality test expressed as definitely as such a cloudy concept would admit of [348 U.S. pp. 339–340, 75 S.Ct. p. 384, 99 L.Ed. 354]:

"The warranty of seaworthiness does not mean that the ship can weather all storms. It merely means that 'the vessel is reasonably fit to carry the cargo'. * * * If it is not, the owner is liable, irrespective of any fault on his part. * * *

"We see no reason to draw a line between the ship and the gear on the one hand and the ship's personnel on the other. A seaman with a proclivity for assaulting people may, indeed, be a more deadly risk than a rope with a weak strand or a hull with a latent defect. The problem, as with many aspects of the law, is one of degree. Was the assault within the usual and customary standards of the calling? Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature? If it is the former, it is one of the risks of the sea that every crew takes. If the seaman has a savage and vicious nature, then the ship becomes a perilous place. A vessel bursting at the seams might well be a safer place than one with a homicidal maniac as a crew member.

"We do not intimate that Gonzales is a maniac nor that that extreme need be reached before liability for unseaworthiness arises. We do think that there was sufficient evidence to *justify the District Court in holding that Gonzales had crossed the line, that he had such savage disposition as to endanger the others who worked on the ship. We think the District Court was justified in concluding* that Gonzales was not equal in disposition to the ordinary men of that calling and that the crew with Gonzales as a member was not competent to meet the contingencies of the voyage. * * *" [Emphasis supplied.]

In the case before us, the libels do not show that Holmes had a wicked disposition, a propensity to evil conduct, a savage and vicious nature, or that he was a homicidal maniac. The master's statement which appellant has placed in the record shows that Holmes had, prior to the apparently sudden and unexpected onset of the mental illness, been perfectly normal, performing his work efficiently, even to the day of the self-inflicted

5. Jones v. Lykes Bros. S.S. Co., 2 Cir., 1953, 204 F.2d 815, reversing opinion of the District Court, 108 F.Supp. 323.

wound. The libels aver merely that Holmes was not equal in disposition, personality, and/or temperament to the average man who follows the sea *at the time of his mental and emotional breakdown,* ostensibly as deducible solely from the fact of his psychotic act.

The Supreme Court has said that the failure of a crewman to measure up to the norm is a problem of degree, and that there is a line which must be crossed in this evanescent zone before a fact finder would be permitted to visit upon a vessel the characterization of unseaworthiness. We think it is quite doubtful if the facts of this case would satisfy the tests adverted to by the Supreme Court in Boudoin even if, as prayed by appellant, we should hold that the ship's liability would be the same when Holmes assaulted himself as it would have been if he had assaulted another member of the crew and inflicted the same injury.

But we do not have to base our decision upon an answer to that question. We do not think that the rule of Boudoin and the others employing like reasoning applies to this case where the appellant amputated his own hand under the circumstances here presented.

Appellant's main reliance is upon what he conceives to be the trend of Supreme Court decisions which he thinks point to the likelihood that recovery by a seaman for injury aboard ship will ultimately be held to be practically automatic. The specific case he cites as supporting his contention is Holley, Administratrix et al. v. The SS Manfred Stansfield, Etc. et al., U.S.D.C.E.D.Va., 1960, 186 F.Supp. 212.[6]

Holley was killed when a large block of solidified muriated potash fell on him as he was operating a payloader in the ship's hull, and his administratrix sued for recovery on the theory both of negligence and unseaworthiness. The first decision in the case was reversed by the Court of Appeals and remanded for application of the rule of comparative negligence and for further application of Virginia law which fixed the rights of the parties, inasmuch as the fatal accident happened in the inland waters of that state.

The District Judge, in trying the case after remand, dealt at some length with recent cases from the Supreme Court[7] and expressed the opinion that our case of Morales v. City of Galveston, 5 Cir., 275 F.2d 191, was not sound law in the light of the latest Supreme Court decisions. Applying what he conceived to be the new look in admiralty cases (D.C., 186 F.Supp. 212, 215), he used this language in concluding that Holley's administratrix was entitled to recover under the doctrine of unseaworthiness of the vessel:

> "Irrespective of personal views, the law respecting the warranty of seaworthiness is clarified for better or for worse. As incongrous as it may seem, the fact that the unseaworthy condition was created and put into effect solely by the action of the decedent herein affords no defense to the shipowner under the teachings of Grillea, Crumady, and Mitchell."

The District Court awarded the widow an amount which represented fifty per

6. The history of that case is epitomized in the first paragraph of the opinion of the District Court (186 F.Supp. 212): "This case was previously before this Court at which time the libel was dismissed for reasons fully stated in an opinion reported in Holley v. The Manfred Stansfield, D.C.E.D.Va., 165 F.Supp. 660. On appeal, following the later decision in The Tungus v. Skovgaard, 358 U.S. 588, [79 S.Ct. 503, 3 L.Ed.2d 524], the United States Court of Appeals for the Fourth Circuit held that the negligence of the decedent would not completely bar a recovery under Virginia law as the death occurred on navigable waters. Holley v. The Manfred Stansfield, 4 Cir., 269 F.2d 317, 322. Certiorari was denied, Reederei Blumenfeld, G. M. B. H. v. Holley, 361 U.S. 883 [80 S.Ct. 154, 4 L.Ed.2d 119]. * * *"

7. Including Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941; and Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L. Ed.2d 413.

cent of what the Virginia law allowed, making the deduction from the full amount of such allowance because of the contributory negligence of the decedent.

Appellant has, therefore, placed before us one District Court case which awards recovery to a seaman for a condition of unseaworthiness even though it was created by his own negligence. But we do not think that this case announces the correct rule, being of the opinion that the true rule is set forth in the cases which will now be discussed.

Speaking of the Holley case, the District Court for the Southern District of New York in Cavelleri v. Isthmian Lines, Inc., 1961, 190 F.Supp. 801–802, said this:

"It is argued however, that Holley v. The Manfred Stansfield * * * warrants a recovery by the plaintiff even when the plaintiff's own fault was the sole cause of the accident, if the plaintiff's fault operated to make the ship unseaworthy. However, the Holley opinion is somewhat ambiguous in this respect, and it is difficult to reconcile the court's fixing of the extent to which the plaintiff's decedent's negligence contributed to the accident at 50% with a finding that the decedent's negligence was the sole cause of the accident. * * *

" * * * Any extension by Holley beyond prior law can be justified solely on the basis of the sympathies with which the Supreme Court has lately viewed the interest of seamen and longshoremen. * * *."

Meantime, the Court of Appeals for the Third Circuit [8] rendered a decision which is in conflict with the Holley case, wherein it upheld the decision of the District Court dismissing a libel based both on negligence and on unseaworthiness. The District Court found, and the Court of Appeals affirmed, that the evidence "showed clearly that the boom fell because appellant had loosened one or two of the figure eight convolutions of the topping lift from the kingpost." The holding was in these words:

"Now for the first time, appellant advances a rather novel theory of unseaworthiness. He argues that loosening the topping lift made the boom unseaworthy, and that a seaman may recover even though the unseaworthy condition is created solely by his own act."

A recent decision from the Fourth Circuit [9] cites Donovan with approval and holds that an injury resulting solely from the act of the injured person is not actionable. The second syllabus sums up the holding in these words: "A longshoreman could not recover for injuries sustained aboard a vessel while attempting to raise a hatch cover, where appliance used by longshoreman was seaworthy, and his own act was sole cause of his injury."

This Court has referred to the Donovan case twice.[10] In each instance Donovan was recognized as valid authority for the principle that recovery cannot be had by a seaman injured solely by his own act. In each of the cases we distinguished the facts then before us from those in the Donovan case, but we did not question the authority of that case. Insofar, therefore, as the question whether a seaman can recover for injury resulting solely from his own act of negligence is applicable to the case before us, we hold that the weight of authority and the better reasoned cases decide that recovery may not be had.

We have here, of course, a claim based upon appellant's deliberate, if irresponsible, act which presents a somewhat different question from that dealt with in Donovan and the other cases discussed. In determining whether recovery may be

8. Donovan v. Esso Shipping Co., 3 Cir., 259 F.2d 65, 67, certiorari denied 359 U.S. 907, 79 S.Ct. 583, 3 L.Ed.2d 572.

9. Williams v. The S.S. Richard DeLarrinaga, Etc., 1961, 4 Cir., 287 F.2d 732.

10. Schlicter v. Port Arthur Towing Co., 5 Cir., 288 F.2d 801, 803; and June T., Inc. v. King, 1961, 5 Cir., 290 F.2d 404, 407.

had in this case on the ground of unseaworthiness, the question whether the act causing the injury was the rational act of the appellant is not controlling. A similar question would be presented if the appellant had fallen from the crow's nest because of a heart attack, an epileptic seizure, or a fainting spell which came upon him without forewarning. An analogous situation would be presented if appellant, seized by a sudden fit of despondency, had deliberately cast himself overboard. Neither the Supreme Court nor any other court has hinted that unseaworthiness would exist in any such situation, or that a person who was injured or lost his life under such circumstances could recover under that doctrine. In the absence of any such authority we hold that there may not be recovery.

This conclusion is buttressed by the uniform expressions of public policy found in congressional enactments dealing with liability to persons injured whose vocations are not unlike that of appellant. We assume that it would not be contended that these elected representatives of the people have a less tended solicitude for those who go down to the sea in ships than do judges.

The United States Employees' Compensation Act[11] provides the only remedy available to merchant seamen employed on vessels owned by the United States, Patterson v. United States, 359 U.S. 495, 79 S.Ct. 936, 3 L.Ed.2d 971. This statute contains these words: " * * * no compensation shall be paid if the injury or death is caused by willful misconduct of the employee or by the employee's intention to bring about the injury or death of himself or of another * * * " A like limitation is found in the Longshoremen's and Harbor Workers' Compensation Act[12] whose provisions have by law been made applicable to certain employments in the District of Columbia[13] and to employees at military bases outside of the United States[14] and to the Outer Continental Shelf Lands Act.[15]

We think that the decision of the court below is sound and its judgment is affirmed.

Affirmed.

RIVES, Circuit Judge (concurring specially).

With much of the reasoning of libelant-appellant I would agree. Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941, removes any doubt that the shipowner's duty to provide a seaworthy vessel is "absolute," that is, a kind of liability without fault, and that the duty applies to an unseaworthy condition which may be only temporary. See also our last opinion in Morales v. City of Galveston, 1961, 5 Cir., 291 F.2d 97, 99, from which the Supreme Court has granted certiorari, 368 U.S. 816, 82 S.Ct. 104, 7 L.Ed.2d 23, but has not yet decided the case on its merits. It is no barrier to recovery, therefore, that Holmes' mental illness came on suddenly and without warning to the shipowner or to himself.

Boudoin v. Lykes Bros. S. S. Co., 1955, 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354, makes clear that the warranty of seaworthiness extends to the crew as well as to the ship and its gear. If a mentally ill shipmate had amputated Holmes' hand, or if Holmes, while suffering a mental and emotional breakdown, had inflicted injury on a shipmate, it seems to me that the personal injuries would be sustained as the proximate result of the unseaworthiness of the vessel and the shipowner would be liable.

Why should the result be different when the victim of the unseaworthiness produced by Holmes' schizophrenia chances to be Holmes himself rather than some other member of the crew? Surely not, as suggested by the majority, be-

---

**11.** 5 U.S.C.A. § 751 et seq. These statutes have been amended as late as 1958.

**12.** 33 U.S.C.A. §§ 901 et seq., 903(b).

**13.** 45 Stat. 600, D.C.Code 1961, §§ 36–501, 36–502.

**14.** 42 U.S.C.A. § 1651 et seq.

**15.** 43 U.S.C.A. § 1333(c).

cause of some public policy expressed by Congress in excluding liability for compensation to an employee whose injury is caused by his own willful misconduct, for as this Court has held, suicide resulting from insanity is not willful so as to be within the statutory exception from compensability. Voris v. Texas Employers Ins. Ass'n., 5 Cir., 1951, 190 F.2d 929.

Nor is the absence of precedent so significant when we consider that, "until the mid 1940's the seaman's right to recover damages for injuries caused by unseaworthiness of the ship was an obscure and relatively little used remedy." Gilmore & Black, The Law of Admiralty, p. 315, § 6–38.

More plausible might be the differing difficulties in proof that the injuries proximately result from employment on the ship, when the injuries are suffered by the deranged seaman himself and when they are suffered by a shipmate. If that were the true distinction, then Holmes might be able to recover if he could show that unusual hardships of life at sea or in foreign lands were the cause of his mental and emotional breakdown. That would be, of course, a question of fact to be determined after a trial on the merits. I do not believe that the door should be opened even to that extent.

A holding that a seaman's own deficiencies rendering his ship unseaworthy would entitle the seaman to recover damages for injuries caused by such unseaworthiness would give rise to extremely far-reaching results. Under such a holding, recovery of damages might be had on behalf of the victim of his own physical illness; for example, poor eyesight, a heart condition, or tuberculosis of such character as to render the ship unseaworthy. The survivors of a seaman who committed suicide might be entitled to recover on the theory of unseaworthiness of the vessel. A seaman injured in a brawl with another brought on by the seaman's own wicked disposition or savage and vicious nature might be entitled to recover because the concept of unseaworthiness exists independently of any

fault. A holding that would give rise to such results can hardly be in the public interest. When the uncertainties and difficulties of proof are considered, it would seem to be a wiser rule to impose upon the seaman the risk of injuries caused by himself or by his own deficiencies.

Some useful analogy may be drawn from cases where a ship has become unseaworthy due to the fault of a stevedoring company. In such cases the Supreme Court has held that the stevedoring company is liable to indemnify the ship upon the theory that the ship's damages were sustained as a result of the stevedoring company's breach of its implied warranty of workmanlike service. Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corporation, 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L. Ed. 133; Weyerhaeuser S. S. Co. v. Nacirema Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413. So in the present case, I would think that the seaman warranted his own fitness at the time he joined the ship, and further agreed to perform his duties in a workmanlike manner. Through no fault of either the seaman or the ship, it became impossible for the seaman to perform his contract. Such impossibility, though it rendered the ship unseaworthy, should not make the ship liable to the seaman himself.

Whatever the theory, it seems to me that a seaman should not be allowed to recover damages for injuries caused by unseaworthiness when the deficiencies of the seaman himself produce the unseaworthiness. If liability of the shipowner for such unseaworthiness is to be so extended, that should be done by the Supreme Court. Thus far it seems to me that the extent of liability of the shipowner to the seaman himself in such cases is for maintenance and cure. The original libel asserting a claim for maintenance is still pending in the district court.

For the foregoing reasons, I concur specially.