## JENSEN v. UNITED STATES.

### No. 10138.

United States Court of Appeals Third Circuit.

Argued June 5, 1950.

Decided Aug. 18, 1950.

Before BIGGS, Chief Judge, and GOODRICH and KALODNER, Circuit Judges.

Thomas E. Byrne, Jr., Philadelphia, Pa. (Gerald A. Gleeson, United States Attorney, Mark D. Alspach, and Krusen, Evans & Shaw, all of Philadelphia, Pa., on the brief), for appellant.

Abraham E. Freedman, Philadelphia, Pa. (Charles Lakatos, Wilfred R. Lorry and Freedman, Landy & Lorry, all of Philadelphia, Pa., on the brief), for appellee.

BIGGS, Chief Judge.

This is an action brought pursuant to Section 2[1] of the Suits in Admiralty Act,

---

1. Section 2, in pertinent part, provides: "In cases where if such vessel were privately owned or operated * * * a proceeding in admiralty could be main-

46 U.S.C.A. § 742, and the Jones Act, § 33 of the Merchant Marine Act of June 5, 1920, c. 250, 41 Stat. 1007, 46 U.S.C.A. § 688, which amended Section 20 of the Act of March 4, 1915, c. 153, 38 Stat. 1185. The pertinent provisions of Section 33 are set out in the margin.[2] The suit is one to recover damages for personal injury and also for maintenance and cure. The court below awarded both damages and an additional amount for maintenance and cure. The United States has appealed from that portion of the judgment allowing Jensen damages.

The circumstances are as follows: On the night of October 14, 1945 the S.S. "William Phips", a vessel within the purview of Section 1 of the Suits in Admiralty Act, 46 U.S.C.A. § 741 and chartered by the War Shipping Administration, was anchored in Luzon Bay in the Philippine Islands. About 11:30 P.M. about thirty members of the crew and two ship's officers were returning to the Phips in the ship's launch. Jensen, a seaman, the plaintiff herein, was in the launch, as was Bennett, the ship's carpenter and Enchura, an oiler. Bennett, carrying a bottle of whiskey, was drunk and quarrelsome. He picked a quarrel with Enchura and had to be restrained from attacking him in the launch. One of the ship's officers told Bennett to "wait until they got back on the ship." Someone in the launch, whether an officer or a member of the crew, does not appear, said: "When you get aboard the ship then you can have it out." Enchura said: "That is all right with me." There is testimony from which

it may be inferred that it was the custom on the Phips to permit members of the crew to fight each other, using one of the hatch covers as a ring. The evidence warrants the assumption, made by the court below, that this custom was to be availed of on the instant occasion by a fight between Bennett and Enchura for the edification of the ship's company.

When the launch got alongside the Jacob's ladder at the Phips' side the officers went up first. Enchura was next and on reaching the Phips' deck, he went to the number 4 hatch where he waited for Bennett. As the men came on deck from the launch, they and a number of the ship's company, including officers, gathered around the number 4 hatch in anticipation of the coming fight. The floodlights were on, which illuminated the hatch cover which made a suitable ring. Bennett came up the Jacob's ladder just before Jensen, who was the last to leave the launch. Jensen followed Bennett up the ladder and as the latter stepped over the ship's rail Jensen saw Bennett draw a knife from his hip pocket and conceal it under a raincoat he carried over his right arm. The knife apparently had been part of the emergency equipment on board the launch. Bennett dropped the raincoat and ran toward Enchura with the open knife in his hand. Jensen ordered Bennett to drop the knife and attempted to grap him in order to disarm him. Bennett turned and slashed Jensen's right palm, severing completely the flexor tendon of the right little finger and the *ulnar* "branch".[3] One of the ship's of-

tained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States * * *."

2. The section is as follows: "Sec. 20 [§ 688]. That any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury

the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

3. It is not clear from the testimony whether the term "branch" was a reference to the *ulnar* artery or to the *ulnar* nerve. Circumstances indicate that the reference was to the *ulnar* nerve.

ficers, Posner, an assistant engineer, was close enough to Bennett to see the knife despite the fact that after Bennett was disarmed the weapon was quickly thrown overboard. No officer gave any order to Bennett nor attempted to restrain him in any way.

Immediately after the attack the master of the vessel sewed together the outer surfaces of Jensen's wound but did not suture the tendons. On the next day Jensen was taken ashore and was examined by a United States Army doctor at a base hospital in the Philippines.[4] No treatment was administered by the doctor who suggested that Jensen seek surgical aid on his return to the United States. The Phips remained at anchor in Luzon Harbor for about five weeks before she sailed for the United States. On the day before the vessel sailed the master again sent Jensen to the hospital. Jensen returned with a note from the same "army doctor" which stated in part as follows: " * * * lacerated tendon, fifth finger, right hand (old) Advise hospitalization on return to States. Not necessary to be done here." Upon Jensen's return to the United States he received surgical treatment but because of the delay in treatment the tendons had retracted and atrophied causing him to suffer a permanent impairment of the function of his right hand.

The court below found in substance that the ship's officers were negligent in not preventing the knifing and that the army doctor was negligent in his treatment of Jensen's injury. The court below allowed recovery upon the first ground but rejected as a basis of recovery the negligent treatment of Jensen's injury by the army doctor. See 88 F.Supp. 541, 543. In the view that we take of the case it is not necessary to discuss at length the negligence of the army doctor.

Preliminarily we state that this court in Brown v. C. D. Mallory & Co., 3

Cir., 122 F.2d 98, 100–102, held that an injured seaman may maintain an action in admiralty under the Jones Act as distinguished from an action at law. We said " * * * the right of a seaman to proceed under the Jones Act without trial by jury is a right to proceed under an existing modified system of maritime law.", and the "The decision of the Supreme Court in Panama R. Co. v. Johnson [264 U.S. at pages 375, 388, 44 S.Ct. 391, 68 L.Ed. 748] extended the scope of Section 20 to give an injured seaman an action upon the admiralty side of the District Court." As we have indicated the Suits in Admiralty Act provides that suit may be brought by a libel in personam against a vessel owned by the United States or by a corporation owned or operated by the United States or its representatives. See Section 2, 46 U.S. C.A. § 742, and note 1, supra. The Phips was operated for the United States by the War Shipping Administration as a merchant vessel under a charter party entered into between the War Shipping Administration and Eastern Steamship Lines. The case at bar was tried to the court without a jury. It follows, therefore, that if Jensen suffered injury because of the negligence of the ship's officers, he is entitled to recover damages.

We are of the opinion that the judgment of the court below must be affirmed on the ground found by the court below. It is clear that Bennett was drunk and belligerent. He started a fight in the launch and the suggestion of one of the officers there present, viz., that he was " * * * to wait until [he] got back on the ship.", while of aid in preventing a fight in the small boat which might have swamped it, was an incitement to the drunken carpenter to commit further violence on board the Phips. Officers and men alike, looked forward with avidity to the contemplated fight between Bennett and Enchura. There was no reason why the master or other officers of the Phips should anticipate that this

4. Neither the hospital nor the doctor is named in the testimony. It would appear that the hospital was one under the authority of the United States Army and that the doctor was one of the commissioned personnel attached thereto. In the view which we take of the case further identification is unnecessary.

fight would be conducted according to the Marquis of Queensbury rules. It was to be a brawl between a drunken carpenter and an oiler after shore leave. It was within the "realm of foreseeability", as the District Judge stated in his opinion, that some lethal weapon might be employed by Bennett not only in respect to Enchura but upon the person of anyone who interfered with his will to commit mayhem. In our opinion the employment of a lethal weapon by Bennett was reasonably foreseeable. The atmosphere on board the Phips was excited and disorderly. Proper discipline was not maintained on board the ship. Bennett, as soon as he had reached the Phips' deck, should have been taken into custody, or at least have been ordered to his room by one of the ship's officers who had been in the launch.

█ █ Under the circumstances we have no difficulty in concurring with the views expressed by the District Judge. The master and the ship's officers were under a duty to see to the safety of the crew. They failed in that duty. Koehler v. Presque-Isle Transp. Co., 2 Cir., 141 F.2d 490; Pfingstler v. Continental Steamship Co., 1940, A.M.C. 1665; The Hamakua, 1940 A.M.C. 532; Wilcox v. United States, D. C., 32 F.Supp. 947, 1940 A.M.C. 424, and Hong v. United States, D.C., 59 F.Supp. 794. Cf. Escandon v. Pan American Foreign Corporation, 5 Cir., 88 F.2d 276. Compare also Jamison v. Encarnacion, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082, and Alpha S.S. Corp. v. Cain, 281 U.S. 642, 50 S.Ct. 443, 74 L.Ed. 1086.

█ Quite aside from the duty of a ship arising under the Maritime Law to furnish adequate medical treatment for an injured seaman it is well established that where the medical treatment furnished by the tortfeasor is lacking in proper skill or care and the injury resulting from the original negligence is aggravated because of this, recovery for the consequent aggravated injuries may be imposed upon him. See Restatement, Torts, Sections 457–9, and the examples cited thereto. Sauter v. N. Y. Cent. & H. R. R. Co., 66 N.Y. 50, 23 Am.Rep. 18; Selleck v. City of Zanesville, 100 Wis. 157, 75 N.W. 975, 41 L.R.A. 563, 69 Am.St.Rep. 906; Dewhirst v. Leopold, 194 Cal. 424, 229 P. 30; Wallace v. Pennsylvania R. Co., 222 Pa. 556, 71 A. 1086, 128 Am.St.Rep. 817.

█ We entertain no doubt that the United States by Section 2 of the Suits in Admiralty Act consented to be sued and to pay damages on such a basis. Certainly a private shipowner would be liable on the ground stated and the United States has consented to be sued as if it were a private shipowner.

The negligence of the army doctor, as we have indicated, has been asserted as a ground for recovery, separate and apart from the negligence of the ship's officers in not preventing the knifing. If this ground be employed as the basis for recovery it is obvious that the cause would have to be remanded to the court below to ascertain, if possible, that portion of Jensen's damages which resulted from improper medical care. Such a course would be futile under the circumstances even assuming *arguendo* that the United States has consented to be sued by virtue of Section 2 of the Suits in Admiralty Act for such negligence as was that of the army doctor. We of course do not decide this question.

The judgment of the court below will be affirmed.