In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00008-CV


______________________________




RIGDON MARINE CORPORATION, Appellant



V.



BOBBY ROBERTS, JR., Appellee




 


On Appeal from the 273rd Judicial District Court


San Augustine County, Texas


Trial Court No. CV 06-8843




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Moseley



O P I N I O N



 A melee which approached mutiny by an unruly crew on the coast of Angola, Africa, led to
the brutal beating of Captain Bobby Roberts, Jr., the ship's master. Roberts brought suit against his
employer, Rigdon Marine Company (Rigdon), owner of the Iberville ship, for Jones Act negligence
and for failure to provide a seaworthy crew and vessel. (1) A jury awarded Roberts a total of
$1,505,000, including $1,150,000 in lost future earning capacity. Rigdon appeals the jury's Jones
Act negligence and unseaworthiness findings, as well as the lost earning capacity award, alleging
both legal and factual insufficiency to support the verdict. Rigdon also challenges the trial court's
denial of its request to submit proposed "foreseeability" and "savage disposition" jury instructions. 
We affirm the judgment of the trial court because we find the evidence sufficient to support the jury's
verdict and the requested instructions to be potentially misleading embellishments to the well-established Fifth Circuit Pattern Jury Charges. 

I. MUTINY ON THE IBERVILLE

 Roberts was originally hired by Rigdon to work as master aboard the vessel Bienville, a sister
ship of Iberville. The Bienville and Iberville were both stationed in Angola to supply the drilling rigs
working in the offshore hydrocarbon fields of Angola; both vessels had crews comprised of a mix
of Americans and Angolans. According to Rigdon personnel, the Iberville's crew, including its then-captain, Jay Heater, had engaged in drug use while on board. Drinking and fighting, activities
proscribed by company policy, had been reported by Rigdon employees as having occurred aboard
the Iberville. Rodney Abshire, Rigdon's marine superintendent in Angola and the overall supervisor
of the crews of both the Bienville and the Iberville, asked Roberts to move from the Bienville to
replace Heater due to the reported violations of Rigdon policy, an act done presumably in the hope
that Roberts would be able to quell the prohibited conduct. In order to better ensure Roberts's safety
in the task, Abshire promised to remove certain troublesome members of the crew from the ship. This promise to ensure Roberts's safety was rendered meaningless when Roberts was brutally
assaulted during his first day aboard the Iberville. When Roberts first boarded the deck, he
encountered Heater, who maintained to Roberts that he (Heater) was to remain in charge and that
Roberts was only to assume the duties of the relief captain; after this declaration, Heater suggested
that Roberts place his belongings in the relief captain's quarters. Abshire, who arrived onboard the
Iberville with Roberts, quickly corrected Heater by confirming Roberts was indeed "coming on as
the lead." As problems presented themselves throughout the day, Heater would repeatedly ask
Roberts when issues arose, "Do you want me to handle this as the captain or are you going to handle
it as the captain?" Heater generally appeared irritated that Roberts was relieving him of his position
as captain of the Iberville.

 Three major events, all occurring within twenty-four hours, establish the unruliness of the
Iberville's crew. First, an American crew member who did not have permission to go into town, left
the craft and returned intoxicated and had either sat or spat on a local Angolan. The Angolan
members of the crew took great umbrage at this display of disrespect toward their countryman, and
a virtual riot broke out among them, during which they made the demand that the offending
American crewman be immediately ejected from the ship. The immediate unrest appeared to have
been assuaged by Roberts's assurance to the Angolans that the offending American crew member
would be escorted off the vessel the following morning. 

 Roberts assumed that the tumult had fully subsided and continued to command the ship from
the vessel's bridge. Heater stuck "his head in the side door" of the bridge and once again asked, "Are
you going to handle this as the captain or am I?" Roberts, attempting to discern the problem to
which Heater made reference, came to the door where Heater stood and was encountered by an
unidentified Angolan assailant on the deck who rambunctiously proclaimed, "You're not the captain,
you die; you die now." The assailant drew a knife and began to pummel Roberts with his fists. 
Roberts managed to escape the assailant and locked himself in the ship's "head" with Heater present
on the bridge with Roberts. Shaken by the incident, Roberts called Abshire, related the occurrences
and his current situation, and asked him to get to the ship as soon as possible. Roberts then secured
the three doors to the bridge and called shore support for further assistance. 

 Irate Angolan crew members began to surround the secured doors shielding Roberts. Heater,
disobeying a direct order from Roberts, opened a locked door, allowing angry Angolans to enter. 
Roberts testified that the Angolans hit him numerous times in the face, kicked him, and caused him
to tumble down the stairs with four of the assailants atop him. At the foot of the stairs, they
continued thrashing Roberts so severely that "there was blood all over the walls." With the aid of
another crew member, Roberts finally extricated himself from them and locked himself in another
room. As a result of this beating, Roberts was bleeding, hurt everywhere, could not see in front of
him at times, and experienced ringing in his ears. When Abshire arrived, Roberts asked to be taken
to a doctor. Although Abshire testified that Roberts looked like he had been assaulted, was "banged
around pretty good" (including a bloodied lip and red eye) and was in fear of his safety, Roberts
claims that two days passed before a doctor was made available to him. As a result of these
incidents, Roberts suffered numerous lasting injuries, including two slipped discs in his back,
thoracic outlet syndrome, "concussive-type syndrome," post-traumatic type headaches, constant
muscle tension, and chronic depression, anxiety, memory loss, and confusion.

II. OVERVIEW OF APPLICABLE MARITIME LAW

 A. Jones Act Negligence 

 By enacting the Jones Act, Congress provided "a seaman injured in the course of
employment" with a cause of action against an employer. 46 U.S.C. § 30104 (2008). To enlarge
protection afforded to seamen under general maritime law, the Jones Act is liberally construed. 
Boutte v. Cenac Towing, Inc., 346 F.Supp.2d 922 (S.D. Tex. 2004). In order to prevail on a Jones
Act negligence claim against his employer, a seaman must establish: (1) personal injury in the
course of his employment; (2) negligence by his employer or an officer, agent, or employee; and
(3) causation to the extent that his employer's negligence was the cause "in whole or in part" of his
injury. Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 436 (4th Cir. 1999); Gautreaux
v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997). Negligence under the Jones Act is
interpreted broadly and is merely a failure to act as a prudent seaman under the circumstances. 
Gautreaux, 107 F.3d at 338. Liability for injuries sustained from Jones Act negligence may be based
on two different, but not inconsistent, theories: the direct negligence theory and vicarious liability. 
E.L. Kellett, Annotation, Liability Under Jones Act or Seaworthiness Doctrine for Injuries Caused
by Assault, 22 A.L.R.3d 624 (1968). To prove direct liability under the Jones Act in an assault case,
the plaintiff must prove that the defendant either knew or should have known of the crew member's
felonious and criminal propensities. Birks v. United Fruit Co., 48 F.2d 656, 657 (D.C. N.Y. 1930). 
An employer may also be liable under the direct theory for other acts of direct negligence, such as
allowing fights among the crew, failing to enforce rules prohibiting alcohol and drugs on board, or
otherwise failing to provide for an employee's safety. Colburn v. Bunge Towing, Inc., 883 F.2d 372,
374 (5th Cir. 1989) (fundamental duty of Jones Act employer is to provide seaman employees with
reasonably safe place to work); Stankiewicz v. United Fruit Steamship Corp., 229 F.2d 580, 582 (2nd
Cir. 1956); Jensen v. United States, 184 F.2d 72, 74-75 (3rd Cir. 1950). 

 Recovery under the vicarious liability theory requires proof that the assailant was acting
within the scope of his employment or in furtherance of his employer's business. Miles v. Melrose,
882 F.2d 976, 983-84 (5th Cir. 1989). The law is clear that an assault is not in furtherance of the
master's business when it is committed by the crew upon the master. Birks, 48 F.2d 656. However,
in contrast to the direct liability theory, no proof is required to show that the assailant was of vicious
or dangerous character or that the employer had reason to anticipate the assault. Miles, 882 F.2d at
983-84; 22 A.L.R.3d 624. 

 The causation burden for the claimant under the Jones Act is described as "featherweight." 
Miles, 882 F.2d at 983-84; Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406 (Tex. 1998). If proof
justifies the conclusion that the employer's negligence "played any part, even the slightest, in
producing the injury," the causation burden is met. Gautreaux, 107 F.3d at 335; Ellis, 971 S.W.2d
at 406. This can be accomplished by "very little evidence." Miles, 882 F.2d at 984. 

 B. The Warranty of Seaworthiness 

 Maritime law also provides a cause of action for injuries resulting from defects or
insufficiencies of a vessel, its crew, or its appurtenances that undermine the vessel's seaworthiness,
render it unfit for its intended use, or make the vessel an unsafe place to work. Rivera v. Herndon
Marine Prods., Inc., 895 S.W.2d 430, 434 (Tex. App.--Corpus Christi 1995, writ denied). The
warranty of seaworthiness is a species of liability without fault. Boudoin v. Lykes Bros. Steamship
Co., 348 U.S. 336, 337 (1955). An owner of a vessel is under an absolute, nondelegable duty to
furnish a safe, seaworthy ship, complete with a competent crew. Miles, 882 F.2d at 981;
Wiradihardja v. Bermuda Star Line, Inc., 802 F.Supp. 989, 994 (S.D. N.Y. 1992). This duty is
completely independent of an owner's duty under the Jones Act. Thus, to succeed on a claim for
unseaworthiness, a plaintiff must only show that "the unseaworthy condition of the vessel was the
proximate or direct and substantial cause of the seaman's injuries." Hernandez, 187 F.3d at 439;
Comeaux v. T.L. James & Co., 702 F.2d 1023, 1024 (5th Cir. 1983). It is now settled that the
employer's lack of knowledge of the assailant's character is no barrier to liability under the
seaworthiness doctrine. Boudoin, 348 U.S. at 339-40; Keen v. Overseas Tankship Corp., 194 F.2d
515, 518 (2nd Cir. 1952). This proposition is in accord with the nature of the doctrine as a no-fault
"warranty." 

 In his 1732 work, Gnomologia, English clergyman Dr. Thomas Fuller said, "He that will not
sail till all dangers are over must never put to sea." Since sailors lead a rough life on the seas and
are "more apt to use their fists than office employees," the no-fault warranty does not mean that a
shipowner is liable for injuries "resulting from every sailors' brawl." Boudoin, 348 U.S. at 338-39;
Miles, 882 F.2d at 981. In the case of an assault, liability turns on whether the assault was within
the usual and customary standards of calling or whether it was committed by a seaman with a wicked
disposition, a propensity for evil conduct, or a savage and vicious nature. Boudoin, 348 U.S. at 340. 
If the assaulting seaman has such a disposition, the ship is considered to be a perilous place. Id. An
attack or threat with a dangerous or deadly weapon is sufficient to establish unseaworthiness. 
Hildebrand v. S.S. Commander, 247 F.Supp. 625, 627 (E.D. Va. 1965) (assailant third officer was
incompetent crew member when he initiated unprovoked attack using threat of pocket knife, such
that second officer's claim of unseaworthiness was sustained); 22 A.L.R.3d 624. 

III. PROPER DENIAL OF RIGDON'S PROPOSED JURY INSTRUCTIONS

 A. Standard of Review 

 An instruction is proper if it might assist the jury in answering the submitted questions,
accurately states the law, and finds support in the pleadings and evidence. Tex. R. Civ. P. 277;
Elbaor v. Smith, 845 S.W.2d 240, 243 (Tex. 1992); Wal-Mart Stores, Inc. v. Middleton, 982 S.W.2d
468, 470 (Tex. App.--San Antonio 1998, pet. denied); La. & Ark. Ry. Co. v. Blakely, 773 S.W.2d
595, 598 (Tex. App.--Texarkana 1989, writ denied). A trial court is afforded more discretion when
submitting instructions than when submitting questions. Middleton, 982 S.W.2d at 470.  Since the
trial court has considerable discretion to determine necessary and proper jury instructions, we review
a trial court's decision to refuse a particular instruction under an abuse of discretion standard. Shupe
v. Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006); In re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000);
Blakely, 773 S.W.2d at 598. An abuse of discretion occurs where a trial court acts arbitrarily,
unreasonably, without consideration of guiding principles, or clearly fails to analyze or apply the law
correctly. Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992); Downer v. Aquamarine Operators,
Inc., 701 S.W.2d 238, 241-42 (Tex. 1985); Middleton, 982 S.W.2d at 469. 

 When a trial court refuses to submit a requested instruction on an issue raised by the
pleadings and evidence, we first determine if the instruction was reasonably necessary to enable the
jury to render a proper verdict. Shupe, 192 S.W.3d at 579; Tex. Workers' Comp. Ins. Fund v.
Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000) (referring to Tex. R. Civ. P. 277, 278). The trial court
should refuse to submit an unnecessary instruction even if it correctly states the law. Blakely, 773
S.W.2d at 599. Well-settled pattern jury charges should not be embellished with addendum. Weeks
Marine, Inc. v. Salinas, 225 S.W.3d 311, 319 (Tex. App.--San Antonio 2007, pet. dism'd). 

 The omission of an instruction is reversible error only if the complaining party establishes
that the omission probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a);
Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 723 (Tex. 2003). Any error in the omission of
an instruction is harmless "when the findings of the jury in answer to other issues are sufficient to
support the judgment." Shupe, 192 S.W.3d at 579-80 (citing Boatland of Houston, Inc. v. Bailey,
609 S.W.2d 743, 750 (Tex. 1980)). 

 B. Procedural History Relating to the Charge

 At the charge conference, the trial court adopted Roberts's charge based on the Fifth Circuit
Pattern Jury Charges. Rigdon objected to the charge because it did not instruct the jury on
foreseeability or an assailant's savage disposition. Rigdon's proposed charge unsuccessfully
requested the inclusion of the following instructions:

 A seaman's employer is legally responsible for the negligence of one of his
employees while that employee is acting within the course and scope of his job. He
is not, however, responsible for an assault unless it is foreseeable and the vessel's
Master could have, but failed to, prevent the assault. 


 Unfit crewmembers constitute just as much of a hazard as unfit gear: liability
can arise if there is evidence that a particular crewmember had a propensity for
violence. However, recovery is not allowed for every typical "sailors' brawl" or
"fisticuffs." 


 Recovery from a shipowner, under the doctrine of unseaworthiness, for an
assault by one of the ship's personnel upon another, may be had if there is proof that
the assailant had such a savage disposition as to endanger the others who worked on
the ship. A seaman meets this standard only if he has a wicked disposition, a
propensity to evil conduct, or a savage and vicious nature. 

The trial court denied Rigdon's request to include these instructions. 

 C. Foreseeability Under the Jones Act

 Rigdon argues that the trial court erred in failing to submit its instruction on foreseeability
to the jury. Rigdon's argument is unsuccessful because the proposed instruction attempts to limit
Roberts's theory of recovery, misstates the law, and is unnecessary. The instruction focuses
specifically on the assault by the unknown seaman and the beating by local Angolans. The trial court
could have determined that the instruction does not assist the jury because it does not address
Roberts's direct liability theory--that Rigdon is liable for not ensuring his safety upon a vessel
known to contain an unruly crew that failed to adhere to company policies against alcohol use, drug
use, and fighting. Also, Rigdon's narrowly drafted proposed instruction begins by discussing the
vicarious liability theory of recovery under the Jones Act. In the following sentence, the instruction
states that Rigdon is not liable for an assault unless it is foreseeable. However, the law is clear that
in contrast to the direct liability theory, no proof of foreseeablity is required under the vicarious
liability theory. Miles, 882 F.2d at 983-84; 22 A.L.R.3d 624. Thus, the instruction misleads the jury
and misstates the law.

 The trial court utilized the Fifth Circuit Pattern Jury Charges, which set forth the elements
of Jones Act negligence--(1) personal injury in the course of employment; (2) negligence by the
employer or an officer, agent, or employee; and (3) causation to the extent that his employer's
negligence was the cause "in whole or in part" of injury. Hernandez, 187 F.3d at 436; Gautreaux,
107 F.3d at 335. The requested embellishment by Rigdon was not necessary to render a proper
verdict per Gautreaux. Since the pattern jury charges are well established, we cannot say that the
trial court acted arbitrarily, unreasonably, or without consideration of guiding principles. Walker,
827 S.W.2d at 840. 

 D. Savage Disposition Instruction Under Warranty of Seaworthiness

 Rigdon's proposed instruction on savage disposition is a correct statement of the law. 
However, it again addresses only one theory of recovery under the warranty of seaworthiness. Proof
of the breach of this warranty is a showing that an assailant had a savage disposition or that the
assault was not ordinary. The proposed instruction omitted that an attack with a dangerous weapon
is an unordinary attack that renders a ship unseaworthy. Hildebrand, 247 F.Supp. at 627;
22 A.L.R.3d 624. (2) Due to this omission, it is possible that the trial court could have found this
instruction as presented would be misleading to the jury. 

 In theory, the jury could feel compelled to render a verdict that the ship was seaworthy if
savage disposition was not proved, even if Roberts proved that an unordinary attack occurred. This
would be an erroneous result. As such, the trial court could have concluded that the instruction
would not aid the jury. Further, the instruction was unhelpful since it focused specifically on the
assaults, yet did not address Roberts's theory that the vessel was unseaworthy because it contained
an unruly crew and was generally not a safe workplace environment. 

 Even if the proposed instruction could have aided the jury, well-settled pattern jury charges
should not be embellished with addenda. Salinas, 225 S.W.3d at 319 (approving trial court's
rejection of instruction on seaman status as embellishment since court used Fifth Circuit Pattern Jury
Charges). Again, because the trial court relied on the Fifth Circuit Pattern Jury Charges (which
correctly stated the law on the warranty of seaworthiness) as its guide, this Court does not determine
that the trial court acted arbitrarily, unreasonably, or without consideration of guiding principles. 
See Walker, 827 S.W.2d at 840. 

 Rigdon's first point of error is overruled. 

IV. THE EVIDENCE IS LEGALLY SUFFICIENT TO ESTABLISH JONES ACT
NEGLIGENCE AND UNSEAWORTHINESS


 A. Federal Standard of Review Applies for Sufficiency Analysis 

 State courts have concurrent jurisdiction with federal courts to try in personam admiralty
actions. 28 U.S.C. § 1333(1) (2008); Garrett v. Moore-McCormack Co., 317 U.S. 239, 249 (1942). 
The United States Supreme Court has expressed its desire to have state courts uniformly apply the
Jones Act and other admiralty law. Garrett, 317 U.S. at 244. Thus, when a state court hears an
admiralty case, the court occupies the same position as a federal court sitting in diversity, and must
apply substantive federal maritime law while following state procedure. Ellis, 971 S.W.2d at 406. 

 The United States Supreme Court's "uniformity requirement extends to the type of proof
necessary for judgment." Garrett, 317 U.S. at 244. Similar to the burden of proof in the Jones Act,
the standard of appellate review is less stringent than under the common law. Ellis, 971 S.W.2d at
406; Salinas, 225 S.W.3d at 322. Under this federal standard, the jury is vested with complete
discretion on all issues of liability, prohibiting this Court from conducting the traditional factual
sufficiency review. Ellis, 971 S.W.2d at 406. Instead, the verdict must be affirmed unless the
evidence points "so strongly and overwhelmingly in favor of one party that the court believes that
reasonable men could not arrive at a contrary [conclusion]." Jones v. Wal-Mart Stores, Inc., 870
F.2d 982, 987 (5th Cir. 1989) (citing Whatley v. Armstrong World Indus., Inc., 861 F.2d 837, 839
(5th Cir. 1988)). In other words, once this Court determines that some evidence supports the verdict
(even though it may be evidence about which reasonable minds could differ), the appellate review
is complete. Ellis, 971 S.W.2d at 406; Miles, 882 F.2d at 981 (holding evidence is sufficient to
support finding of liability under Jones Act unless there is a "complete absence of probative facts"). 
Absent a finding that the verdict is "clearly wrong and unjust," it cannot be set aside. Ellis, 971
S.W.2d at 407. In so determining, this Court views all the evidence in the light most favorable to
the jury's verdict. Jones, 870 F.2d at 987; see also Kansas City S. Ry. Co. v. Catanese, 778 S.W.2d
114, 117 (Tex. Civ. App.--Texarkana 1989, writ denied). Anything more than a scintilla of
evidence is legally sufficient to support the finding. Pilgrim's Pride Corp. v. Smoak, 134 S.W.3d
880, 888 (Tex. App.--Texarkana 2004, pet. denied); Plainview Motels, Inc. v. Reynolds, 127 S.W.3d
21, 29 (Tex. App.--Tyler 2003, pet. denied). 

 The appropriate standard of review to test the sufficiency of the evidence in unseaworthiness
claims tried before a jury determines whether there is a reasonable evidentiary basis for the jury's
verdict. Loehr v. Offshore Logistics, Inc., 691 F.2d 758, 760 (5th Cir. 1982). Where that evidentiary
basis is present, the court's "function is exhausted." Id. 

 B. Evidence Was Sufficient to Support Jury's Finding of Liability Under Jones Act


 Sufficient probative facts in this case suggest that reasonable minds could differ on the
outcome of whether Rigdon was negligent under the Jones Act. See Miles, 882 F.2d at 981; Ellis,
971 S.W.2d at 406. Under the direct theory of liability, an employer can be liable under the Jones
Act for allowing fights among the crew or in failing to enforce rules prohibiting alcohol and drugs
on board. Stankiewicz, 229 F.2d at 582; Jensen, 184 F.2d at 74-75. Based on the testimony that a
crew member left the ship and came back drunk, boarded the ship and was abusive to others,
together with testimony that the crew engaged in drug abuse, alcohol use, and fighting, and that the
very reason that Roberts was reassigned to Iberville from Bienville to quell such conduct in the
future, the jury could conclude that the Iberville's rules prohibiting these activities were not enforced. 
Thus, the jury could have found Rigdon negligent in failing to provide Roberts with a safe place to
work or in failing to provide an adequate, competent crew. 

 By not removing unruly crew members (including Heater, after he proclaimed in Abshire's
presence Roberts was not the captain), the jury could have found that Abshire, Roberts's superior,
breached a fundamental duty of the Jones Act in failing to provide for Roberts's safety. See Colburn,
883 F.2d at 374. In delaying Roberts's medical treatment, even though he was in bad shape, the jury
could have decided that Rigdon was imprudent. See Premeaux v. Socony-Vacuum Oil Co., 144 Tex.
558, 192 S.W.2d 138, 143 (1946). Even focusing on the direct theory of liability for an assault, it
is conceivable that the jury could have determined the assaults committed by an unruly, possibly
dangerous crew, were foreseeable to Rigdon since Abshire was required to replace Heater after
reports of the crew's behavior, and, with the understanding that the crew was dangerous, promised
to provide for Roberts's safety. 

 In sum, based on the evidence, which is viewed in a light most favorable to Roberts's
position, the Court can conclude that the jury's verdict was not clearly unjust and wrong. See Jones,
870 F.2d at 987; Ellis, 971 S.W.2d at 407. 

 C. Evidence Was Sufficient to Support Jury's Finding of Unseaworthiness

 For precisely the same reasoning set out in the previous section, the jury could have found
that Rigdon breached its absolute, nondelegable duty to furnish a safe, seaworthy ship complete with
a competent crew. See Miles, 882 F.2d at 981. Moreover, the jury could have determined that the
assaults committed upon Roberts did not fall into the category of ordinary assaults or sailors' brawls,
but were, rather, vicious and unprovoked attacks. See Miles, 822 F.2d at 981. The jury could
determine that an attack with a knife, even though the knife was not actually employed as a weapon
in the assault, amounted to an attack with a dangerous weapon. Hildebrand, 247 F.Supp. at 627; 22
A.L.R.3d 624. Thus, we can conclude that there was a reasonable evidentiary basis for the jury's
verdict. See Loehr, 691 F.2d at 760. 

 Rigdon's second point of error is overruled. 

V. THE EVIDENCE IS SUFFICIENT TO SUPPORT JURY'S LOST FUTURE
EARNING CAPACITY AWARD


 Earning capacity is the ability and fitness to be employed in exchange for compensation
including salary, commissions, and other benefits. Smoak, 134 S.W.3d at 899 (citing Baccus v. Am.
States Ins. Co., 865 S.W.2d 587, 588 (Tex. App.--Fort Worth 1993, no writ)). Proof of loss of
earning capacity is always uncertain, must be judged on the particular facts of each case, and must
be left largely to the discretion of the jury. Jones, 870 F.2d at 989; McIver v. Gloria, 140 Tex. 566,
169 S.W.2d 710, 712-13 (1943); Port Terminal R.R. Ass'n v. Sims, 671 S.W.2d 575, 578 (Tex.
App.--Houston [1st Dist.] 1984, writ ref'd n.r.e.). Since it is well settled that minors who have never
worked can suffer an injury that diminishes their future ability to work, recovery for loss of future
earning capacity does not require a showing of lost earnings. McIver, 169 S.W.2d at 712; Smoak,
134 S.W.3d at 903. Factors such as stamina, efficiency, weakness, degenerative changes, and the
ability to work even while experiencing pain, are legitimate considerations in determining whether
a person has experienced an impairment in future earning capacity. Smoak, 134 S.W.3d at 899;
Springer v. Baggs, 500 S.W.2d 541, 544 (Tex. Civ. App.--Texarkana 1973, writ ref'd n.r.e.). Thus,
if Roberts demonstrated that pain or any other diminished ability prevented him from getting and
holding a job, he was entitled to a lost future earning capacity award. See Reynolds, 127 S.W.3d at
38.

 The fact that Roberts earned as much as or more during trial than he did before his assault
does not bar him from recovering lost earning capacity. See Jones, 870 F.2d at 990. While the
damages resulting from decreased earning capacity can best be shown by evidence of the amount that
Roberts was capable of earning before he was injured compared to what he was capable of earning
afterward, this type of proof is not required. See Smoak, 134 S.W.3d at 903; Sims, 671 S.W.2d at
578. Rather, the award can be based on a composite of all factors affecting the capacity of a person
to earn. Jones, 870 F.2d at 989-90; Reynolds, 127 S.W.3d at 36. Thus, Roberts was not required
to prove the exact amount of damages, but was only required to present facts from which the jury
could in its sound discretion make a reasoned decision regarding the amount of the award. See
McIver, 169 S.W.2d at 712-13; Springer, 500 S.W.2d at 545 (upholding jury's award of $16,000 lost
earning capacity even though plaintiff went back to work after injury for same employer at same
wage where testimony established plaintiff unable to work overtime, resulting in ten to twenty
percent reduction in work over thirty-six-year life expectancy). 

 Here, trial testimony established that Roberts suffered chronic pain from two slipped discs
in his back, thoracic outlet syndrome, post-traumatic type headaches, and constant muscle tension. 
Even Rigdon's doctor diagnosed Roberts with post "concussive-type syndrome." He also suffered
from chronic depression, anxiety, memory loss, and confusion. Roberts testified that he was having
trouble at work and experienced many headaches, ringing in his ears, exhaustion, panic attacks, had
problems sleeping, and was emotionally upset. He also stated that his doctor preferred that he not
work at all. His psychologist recommended that Roberts take a lesser position at work and expressed
doubt as to whether Roberts would ever again be able to command the larger vessels. Nevertheless,
even though Roberts had difficulty passing the physical examination, he was employed by Hornbeck
to work on smaller boats. This employment, however, was short-lived and Roberts was subsequently
discharged by Hornbeck. At the time of trial, he had worked as needed on small boats for Brown
Water Marine Company on a "time-on/time off" basis. Rigdon's attorney pointed out that because
of his injuries, Roberts was endangering people's lives by working for Brown Water Marine
Company. Based on this testimony, we conclude that Roberts demonstrated that pain or other
diminished ability prevented him from obtaining and holding a job such that he was entitled to a lost
future earning capacity award. 

 To justify the amount of the award, Roberts stated that work on the smaller Hornbeck boats
paid $420 per day. (3) On these boats, he could work 243 days for an annual salary of approximately
$102,000. Prior to his injuries, Roberts could work on larger crafts. The Hornbeck large boats paid
a captain or master $615 per day for an approximate salary of $149,445. (4) Roberts is forty-seven
years old and the closing argument suggested an additional thirty-three years of life expectancy. As
an example of how the jury could reach its award, simply subtracting $102,000 from $149,445 gives
an annual discrepancy of $47,445. Multiplied by thirty-three (Roberts's remaining life expectancy),
the damages for lost earning capacity would equal $1,565,685. The jury may have further taken
Roberts's testimony that he can only work 180 days out of the year, multiplied that by $195 (the
difference between $615 per diem pay for large boats and the $420 per diem pay for smaller boats),
and again multiplied a rounded figure of $35,000 annual loss by thirty-three years to arrive at a loss
of $1,155,000. In sum, based on the numbers and figures presented at trial, we find support for the
jury's $1,150,000 lost future earning capacity award. 

VI. CONCLUSION

 We affirm the judgment of the trial court because: 1) the refusal to submit Rigdon's proposed
instructions was not in error, and 2) there was sufficient evidence presented to support the jury's
findings regarding (a) Rigdon's liability under the Jones Act, (b) a breach of Rigdon's warranty of
seaworthiness, and (c) the lost future earning capacity award of $1,150,000. 




 Bailey C. Moseley

 Justice


Date Submitted: September 10, 2008

Date Decided: October 7, 2008

1. This case has been transferred to this Court as part of the Texas Supreme Court's docket
equalization program.
2. Instead, Rigdon attempts to show examples where vessels were found to be seaworthy even
though deadly weapons were used during assaults. In the following cases Rigdon cited, the courts
concluded that the vessels were not unseaworthy because the plaintiff actually provoked the attack:
Connolly v. Farrell Lines, Inc., 268 F.2d 653 (1st Cir. 1959); Jones v. Lykes Bros. Steamship Co., 
204 F.2d 815 (2nd Cir. 1953); Fountain v. John E. Graham & Sons, 833 F.Supp. 873 (S.D. Ala.
1993); Scurlock v. Wolfe, No. 05-689, 2007 U.S. Dist. LEXIS 26801 (E.D. La. Apr. 11, 2006);
Gulledge v. United States, 337 F.Supp. 1108 (D.C. Pa. 1972). 
3. Roberts also testified that he made $110,000 annually working for Hornbeck while he was
making $102,000 working at Rigdon. However, it is important to note that Roberts attempts to show
that if he had not been injured, he could work the Hornbeck big vessels and make $149,445 per year. 
4. Roberts also noted that he was able to work only 180 days annually instead of the full 243
days per year.

 

 

 








                                                      MEMORANDUM OPINION

 

            In her real
estate partition action against William T. Malone, Wilma Jane Malone sought to
receive, in kind, her one-half undivided interest in 241.475 acres[1]
of land in Lamar County.  After the
parties followed a procedure not conforming with applicable rules, but not
objected to by either party, the trial court awarded William the eastern
120.737 acres by a lake and awarded Wilma the western 120.738 acres adjoining a
county road.  William was also awarded an
easement across Wilmas tract, allowing his tract access west to the county
road.  William appeals.

We affirm the judgment of the trial court
because (1) sufficient evidence supports the judgment, (2) the challenged
procedural errors were waived and harmless, (3) no error in admitting the
commissioners report was preserved, and (4) denying William a second
continuance was within the trial courts discretion.

(1)        Sufficient Evidence
Supports the Judgment

 

In urging that
the evidence is legally and factually insufficient to support the judgment of
the trial court, William claims in part that the lack of a proper and properly
admitted commissioners report in the record is fatal.  Although the record contains no order
appointing commissioners, apparently such appointment had been made and a
report submitted to the trial court.  The
first words spoken by the trial court were, My understanding is we have a
report from the commissioners. 
Unfortunately, however, at that time, the commissioners report was not
filed, and no objections were lodged against it.

            Nevertheless,
at that hearing, the trial court heard evidence from surveyor Pat Murphy, who
was hired by William.  Tract one, the
120.737 acre tract, was labeled the east side of the property.  It was bordered on the east by a lake and on
the west by tracts two through four (the west side).  Because tract one, which William wanted, was
landlocked and did not have access to the county road as did the west side,
Murphy testified that dividing the propertys acreage in half would not yield
equal value.  Murphy opined that, even
with an access easement, the east side would need an additional eighteen acres
from the west side to become equivalent in value.  

            After
hearing the evidence, the trial court found that the property could be divided
in kind, awarded the west side to Wilma and the east side to William, and
granted William an undefined access easement over the west side property.  Because the court did not specify which of
the three tracts on the west side would be subject to the access easement, the
trial court held another hearing December 16, 2009.  At that hearing, Williams attorney
represented to the court that the judgment, basically, is fine, but asked
that a surveyor draw out an easement and that it be included in the final
decree.  

            After
the surveyor had completed the follow-up work, on April 23, 2010, Wilma filed a
motion for judgment, attaching a draft partition decree to her motion.  The trial court set Wilmas motion for an
April 30, 2010, hearing.  Williams
counsel appeared at that hearing, announced not ready because William was
still in the hospital, and then told the court, We have no objection to the
entry of judgment.  It was at this point
that the evidence was re-opened and the commissioners report was introduced as
an exhibit.[2]  

            The report
was not in compliance with the Texas Rules of Civil Procedure.  The report, drafted October 5, 2009, was
unsworn, did not list the estimated value of each share, and did not include
descriptions of the division of property.[3]  In its entirety, the report stated:

As
per your request, the undersigned have personally reviewed the land owned by
the Charles Malone family and have determined that the division of the land
Wendell Moore established, in his survey, is fair and equitable.  We are of the opinion that one-half of this
land would bring the same money as the other one-half.  We have taken into consideration the county
road frontage, the lack of easements, and the soil types in coming to this
conclusion.  

 

On April 30, 2010, the trial court entered the decree
ordering partition in accordance with its November 5, 2009, pronouncement and
specified Williams access easement would be across tract two. 

            The trial court
responded to Williams subsequent request for findings of fact and conclusions
of law.  Hoping to succeed on his claim
that the commissioners report should have been excluded from the courts
consideration, William challenged the legal and factual sufficiency of the
evidence supporting the courts finding that each half of the property as
divided in kind per the commissioner[s] report is equal.  

The findings of fact entered in this case
are of the same force and dignity as a jury's answers to jury questions.  Lambright
v. Trahan, 322 S.W.3d 424, 430 (Tex. App.Texarkana 2010, pet. filed)
(citing Anderson v. City of Seven Points,
806 S.W.2d 791, 794 (Tex. 1991)).  We
review the findings of fact by the same standards that are applied in reviewing
the legal or factual sufficiency of the evidence supporting a jury's answer to
a jury question.  Id. (citing Ortiz v. Jones,
917 S.W.2d 770, 772 (Tex. 1996)). 
Conclusions of law are reviewed de novo. 
State v. Heal, 917 S.W.2d 6, 9
(Tex. 1996).

Evidence is legally sufficient if it would
enable reasonable and fair-minded people to reach the verdict under review.  Lambright,
322 S.W.3d at 430 (citing City of Keller
v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005)).  We credit evidence favorable to the finding of
the court if a reasonable judge acting as a fact-finder could, and will
disregard contrary evidence unless a reasonable judge could not.  Id.  As long as the evidence falls within the zone
of reasonable disagreement, we will not substitute our judgment for the
judgment of the trial court.  Id.  In
this case, the trial court is the sole judge of the credibility of the
witnesses and weight given to their testimony.  Id.
(citing Wilson, 168 S.W.3d at 819).

            When
considering a factual-sufficiency challenge, we consider and weigh all of the
evidence, not just that evidence which supports the trial court's judgment.  Id.  We will set aside the judgment only if it is
so contrary to the overwhelming weight of the evidence that it is clearly wrong
and unjust.  Id. (citing Mar. Overseas
Corp. v. Ellis, 971 S.W.2d 402, 40607 (Tex. 1998)).  Because we are not a fact-finder, we will not
pass on the witnesses' credibility or substitute our judgment, even if the
evidence would clearly support a different result.  Id.
at 407.

            In this
phase of the partition proceeding, the question that must be answered is
whether the commissioners report is materially erroneous or provided unequal
shares, i.e., whether the commissioners fairly and adequately divided the
property.  See Ellis v. First City Natl Bank, 864 S.W.2d 555, 557 (Tex.
App.Tyler 1993, no writ); see also Wallace v. Wallace, No. 96-0165-CV,
1997 WL 57248, at *2 (Tex. App.Amarillo Feb. 12, 1997, no writ) (not
designated for publication).  This
question, which William had the burden to prove, is one of fact.  Ellis,
864 S.W. 2d at 557.  In this case, because
the trial court is the sole judge of the witnesses' credibility and the weight
to be given their testimony, including expert testimony, where the evidence is
conflicting, the general rule is that the resolution of that question by the
fact-finder will not be set aside.  Wallace, 1997 WL 57248, at *2 (citing Leyva v. Pacheco, 163 Tex. 638, 358
S.W.2d 547, 549 (1962)).

            To
try to meet his burden, William presented the trial court with testimony from
Murphy, who believed the east side would need to include eighteen more acres of
land than the west side to be of equal value. 
No other evidence suggesting that the commissioners report was unfair
or unjust was presented.[4]  The court, as finder of fact, could believe
that Murphys testimony did not establish that the commissioners report was
materially erroneous or unequal.  Thus,
the court was free to adopt the commissioners report instead of appointing new
commissioners to the case.  Snow
v. Donelson, 242 S.W.3d 570, 572 (Tex. App.Waco 2007, no pet.); Campbell v. Tufts, 3 S.W.3d 256, 259
(Tex. App.Waco 1999, no pet.); Ellis,
864 S.W.2d at 557.

            The
evidence was legally and factually sufficient.

 

(2)        The Challenged Procedural Errors Were Waived
and Harmless

 

            William
complains on appeal that the trial court generally failed to comply with Rules
76169 of the Texas Rules of Civil Procedure. 
Because the commissioners report was never filed, and the clerk never
sent notice of the report, William claims he missed his opportunity to object
to it, which would require the court to consider whether it was erroneous in
any material respect, or unequal and unjust. 
Because William was not afforded the contemplated opportunity to contest
the commissioners report, he believes the trial court erred in relying on it.  He also argues that the report should not
have been considered because it did not comply with the Texas Rules of Civil Procedure.

            Citing cases
reversing judgments for failure to appoint commissioners in partition actions, William
complains of:  (1) the lack of an order
appointing the commissioners as required by Rule 761; (2) failure to issue a writ
of partition pursuant to Rule 762, designed to give notice to commissioners of
their appointment; (3) failure to serve the writ of partition as required by
Rule 763; and (4) failure to obtain return of the writ pursuant to Rule 765. 

            Our analysis
leads us to conclude that these deficiencies were both waived and harmless.

 

 

 

            A normal
judicial partition involves a two-step process.[5]
 Snow,
242 S.W.3d at 572; Woodland v. Wisdom,
975 S.W.2d 712, 714 (Tex. App.Texarkana 1998, no pet.).  In the first phase, yielding a separate
appealable order, the trial court determines the share or interest of each of
the joint owners or claimants, and all questions of law or equity affecting the
title to such land; decides whether the property is susceptible to partition;
and appoints three commissioners to partition the property in accordance with
the respective shares or interests of each of such parties entitled
thereto.  Snow, 242 S.W.3d at 572; see Tex. R. Civ. P. 760, 761.  Because the court applies rules of equity in
determining how the property is to be divided, any proof or considerations
which may warrant awarding a particular portion of the property to one of the
parties must be made to the fact-finder at this time.  Snow,
242 S.W.3d at 572.

            Next, the
appointed commissioners make the actual division of property in accordance with
the courts decree.  Id.  Action during the second
phase of the suit begins when the commissioners file a written report under
oath describing, inter alia, the
property division, number of shares and the land which constitutes each share,
and the estimated value of each share.  Tex. R. Civ. P. 769.   When the commissioners report is filed, the
clerk shall immediately mail written notice of the filing of the report to all
parties.  Id.  Either party to the
suit may file objections to any report of the commissioners in partition within
thirty days of the date the report is filed, and in such a case a trial of the
issues thereon shall be had.  Tex. R. Civ. P. 771.  In the second partition decree, the trial
court either approves the commissioners report and partitions the property, or
rejects the report and appoints new commissioners to partition the land if it
finds the existing report to be erroneous in any material respect, or unequal
and unjust.  Id.; Snow, 242 S.W.3d at
572.  Untimely challenges to the
commissioners conformity with the Texas Rules of Civil Procedure are
waived.  Snow, 242 S.W.3d at 573.

            First, we
hold that the challenged procedural defects were waived.

 

            We find
nothing in the record demonstrating that William made any specific objection
regarding these matters or otherwise apprised the trial court of any concerns
about them he might have had at trial. 
In fact, the record reflects that Williams counsel told the trial court
that there was no objection to the entry of judgment.  We also note that Williams appellate brief
states that the court and parties all agreed to the appointment of
commissioners.

To preserve an error for review on appeal,
the record must show (1) that the complaint was made to the trial court by a
timely request, objection, or motion that stated the grounds for the complaint
with sufficient specificity to make the trial court aware of the complaint and
(2) that the trial court expressly or implicitly ruled on the request,
objection, or motion.  Tex. R. App. P. 33.1(a)(1), (2); see City of Fort Worth v. Zimlich, 29
S.W.3d 62, 73 (Tex. 2000).  For example, Rule
771 of the Texas Rules of Civil Procedure provides that a party in a real
estate partition action may object to the commissioners' report, but a
complaint cannot be made about the report on appeal if it is not made by
objection to the trial court.  Bierschwale v. Bode, 755 S.W.2d 562,
56465 (Tex. App.San Antonio 1988, no writ). 
None of these errors were preserved for our review.

            We also
believe these problems were harmless.

 

            We may not
reverse a trial courts judgment unless the error complained of probably
caused the rendition of an improper judgment; or probably prevented [William]
from presenting the case to the court of appeals.  Tex. R. App. P. 44.1.  The harmless error rule applies to all
errors, even those involving the violation of procedural rules couched in
mandatory language.  Lone Star Steel v. Scott, 759 S.W.2d 144, 147 (Tex. App.Texarkana
1988, writ denied).  Although the trial
court did not follow procedure, it is also clear that the commissioners were
somehow notified of their appointment. 
William fails to establish any harm occurring from failure to follow
Rules 76163 and 765.

            William
attempts to show how the lack of the proper two-tiered partition structure
compromised the commissioners actions. 
Rule 766 required the commissioners to proceed to partition the real
estate described in the decree of the court in accordance with the directions
contained in such decree . . . .  Tex. R. Civ. P. 766.  Here, the trial court did not issue
any such decree determining the respective shares of the parties after a
balance of the equities, taking into account any improvements on the land as
required by Rule 760.  Campbell, 3 S.W.3d at 259 (proof is made
to fact-finder of existence and value of improvements to property at time of
partition and of other equitable considerations which may warrant awarding
particular portion of property to one of parties).  William argues the commissioners divided the
property in half instead of assessing the monetary value of each tract and
giving each party one-half of the value of the property.  He points to the lack of assessment of value
of each parcel of land as required by Rule 769. 
Again, though it is clear that proper procedure was not followed, the
commissioners reported half of this land would bring in the same amount of
money as the other half.  Thus, harm is
not shown, especially considering Williams counsels statement that there was
no objection to the entry of judgment.

(3)        No Error in Admitting the Commissioners
Report Was Preserved

 

            Among other
complaints, William alleges that the commissioners report was unsworn hearsay
that should not have been considered as evidence.[6]

            Yet, the
trial court may adopt the report of the commissioners unless there is an
objection to the report.  A hearing is
not held until such objection is made.  Hershey v. Duncan, Nos. 13-01-688-CV,
13-02-673-CV, 2004 WL 2471679, at *3 (Tex. App.Corpus Christi Nov. 4, 2004,
pet. denied) (not designated for publication) (citing Redden v. Hickey, 308 S.W.2d 225, 229 (Tex. Civ. App.Waco 1957,
writ refd n.r.e.)).  In holding such a
hearing in this case, the trial court apparently entertained objections to the
commissioners report.  Unless first
timely presented to the trial court with sufficient specificity, we may not
consider new complaints on appeal.  Tex. R. App. P.
33.1.  We find that counsel had an
opportunity to present any objection to the trial court at the November 5,
2009, hearing, and that complaints concerning the commissioners report should
have been presented at that time.  Because
no objection was presented, we overrule Williams contention.[7]

(4)        Denying William a Second
Continuance Was Within the Trial Courts Discretion

 

            The trial
court originally set the case for an August 18, 2009, trial.  Due to medical problems resulting in
Williams hospitalization, the court granted him a first continuance and reset
the matter to be heard November 5, 2009. 
On the day of the reset hearing, counsel filed a second motion for
continuance because William was in the hospital.  The court denied the motion over counsels
plea that William wanted to present evidence of improvements to the property.

            The
decision to grant or deny Williams motion for continuance was within the trial
courts sound discretion.  In re A.D.A., 287 S.W.3d 382, 387 (Tex.
App.Texarkana 2009, no pet.) (citing Villegas
v. Carter, 711 S.W.2d 624, 626 (Tex. 1986)).  The Texas Rules of Civil Procedure state that
a continuance shall not be granted except for sufficient cause supported by
affidavit, or by consent of the parties, or by operation of law.  Tex. R.
Civ. P. 251.  Here, there is no
suggestion that Wilma agreed to the November 5, 2009, continuance or that any continuance
was required as matter of law.  On
appeal, William complains that the trial court should have granted the second
motion for continuance because he was the only witness who had knowledge as to
why the fence on the property gave him more land, and what he did to improve
the value.  Rule 252 of the Texas Rule
of Civil Procedure requires:

If
the ground of such application [for continuance] be the want of testimony, the
party applying therefore, shall make affidavit that such testimony is material,
showing the materiality thereof, and that he has used due diligence to procure
such testimony, stating such diligence, and the cause of failure, if known;
[and] that such testimony cannot be procured from any other source . . . .

 

Tex.
R. Civ. P. 252.

 

            Thus,
[m]ere absence of a party does not automatically entitle him to a
continuance.  Ngo v. Ngo, 133 S.W.3d 688, 693 (Tex. App.Corpus Christi 2003, no
pet.); Jones v. Johns Cmty. Hosp.,
624 S.W.2d 330, 332 (Tex. App.Waco 1981, no writ) (citing Brown v. Brown, 599 S.W.2d 135, 137 (Tex. App.Corpus Christi 1980,
no writ) (denying motion for continuance where party was in hospital)).  Where there is a complete lack of diligence,
a trial court is not required to grant a continuance.  Ngo,
133 S.W.3d at 693.  Williams verified
motion stated only that he was experiencing health problems and would not be able to attend the trial.  At the hearing, Williams counsel merely
stated, My client is in the hospital. 
Before the trial court denied the continuance, there was no argument
made to the court that Williams presence was required because his testimony
would be material, and no showing of diligence. 
Therefore, we find the trial court acted within its sound discretion in
denying the second motion for continuance filed on the day of trial.

 

 

 

 

 

 

 

            We affirm the trial courts
judgment.

 

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          December
23, 2010     

Date Decided:             January
7, 2011

 











[1]The
real estate was composed of four tracts of land, tract one containing 120.737
acres and tracts two through four containing 40.246 acres each.  





[2]After
the exhibit was admitted, Williams counsel stated without further specificity,
Just for the record, note our objection, Your Honor.  William argues that the trial court erred in
re-opening the evidence after both parties had rested and closed.  William did not present this argument to the
trial court in his motion for new trial or otherwise.  Therefore, it was not preserved, and we
decline to review it.  Tex. R. App. P.
33.1.

 





[3]The
report itself contained no description of the property, but referred to a
survey conducted by Wendell Moore dividing the property into four tracts.  





[4]Although
Williams son testified at trial, he could not determine the value of either
piece of land, and did not contribute to the question the trial court was
required to answer.  





[5]Since
the normal two-step partition process yields two appealable orders, Texas
courts have uniformly held that matters decided in the first hearing cannot be
challenged in an appeal from the trial courts second order adopting the
commissioners report and partitioning the property.  Snow,
242 S.W.3d at 572 (citing Campbell, 3
S.W.3d at 259).  As explained herein, the
trial court issued only one final appealable order in this case.  That fact has been confirmed by the Lamar
County District Clerk.  Because the
two-step partition procedure was not followed, we find that we have
jurisdiction to address all of Williams complaints.





[6]Wilma
points out that Rule 771 requires that any objection to the commissioners
report be made within thirty days of the date the report is filed, or it is
waived.  Tex. R. Civ. P. 771; Snow,
242 S.W.3d at 573.  Because the report
was never filed, we decline to employ Rule 771 in this instance.





[7]Even
had there been a proper presentation to the trial court of the many objections
to the commissioners report within Williams brief, again, William would be
required to demonstrate harm while seeking to overcome his counsels statements
to the trial court that there was no objection to the entry of judgment.